JEROME UTLEY v. JOSEPH R. CLEMENTS and Another.

February 2, 1900.

Nos. 11,910—(197).

### Partnership—Fraudulent Dissolution.

From about September, 1886, until October 19, 1894, C., G., and T. were concededly copartners in the banking business under the firm name of the Fillmore County Bank. On the day last mentioned these three persons signed a dissolution notice, in which it was stated that the copartnership was dissolved by mutual consent, and that G. and T. were successors, had assumed all indebtedness, and would collect all accounts. C. retired from all visible participation in the business. G. and T. continued the same until August 20, 1898, when the bank closed its doors, being insolvent. G. died soon afterwards. In this action, brought against C. and T. as surviving members of the firm first above mentioned, by a creditor holding claims on account of deposits made in the bank subsequent to the signing of the dissolution notice, the court below found as a fact that C., G., and T. continued in business as copartners, and under the firm name of the Fillmore County Bank, until the bank closed its doors, and also, in substance, that the alleged dissolution was a sham, and a part of a conspiracy entered into between C. and T. in pursuance of a joint scheme and plan to defraud. Held, that this finding was supported by the evidence.

### Books of Account—Erasures and Alterations.

Held, also, that the trial court did not err when it received in evidence

certain entries made in the books of account kept in the business of the bank prior to the pretended dissolution, which entries had been erased and altered in pursuance, according to oral testimony, of the aforesaid joint scheme and plan, and which tended to show that large sums of money, the funds of the bank, had been appropriated by C., and that evidence thereof had been removed, wholly, or in part, by these alterations.

**Rulings of Court.**

Further rulings of the trial court when receiving the evidence considered and disposed of.

Action in the district court for Fillmore county against Joseph R. Clements and Maurice R. Todd, as surviving partners of a copartnership formerly existing between said defendants and Julia F. Greenleaf, since deceased, under the firm name of the Fillmore County Bank, to recover $24,292.75 with interest on certificates of deposit. The case was tried before Kingsley, J., who found in favor of plaintiff in the sum of $25,708.03. From a judgment entered pursuant to the findings, defendant Clements appealed. Affirmed.

*Losey & Woodward* and *Webber & Lees*, for appellant.

*H. S. Bassett, Brown & Abbott* and *Stephen H. Somsen*, for respondent.

COLLINS, J.

Counsel for defendant Clements fairly state this case in their brief, as follows:

"This action was brought by the plaintiff to recover of the defendants, Joseph R. Clements and Maurice R. Todd, as surviving partners of a copartnership previously existing between said defendants and one Julia F. Greenleaf, since deceased; said copartnership having conducted a general banking business at the village of Preston, in the county of Fillmore, and state of Minnesota, under the copartnership name of the Fillmore County Bank. Said copartnership was formed in September, 1886; and the Fillmore County Bank, under which name said three named persons commenced to do business, continued to receive deposits and do a general banking business until August 20, 1898, when said bank closed its doors and ceased to do business. Subsequent to the time said bank closed

its doors, and prior to the commencement of this action, said Julia F. Greenleaf died. It was claimed on the part of plaintiff that appellant, Joseph R. Clements, continued a member of said copartnership from the time said bank commenced to do business until it closed its doors. On the part of appellant it was contended that said copartnership between himself, Julia F. Greenleaf, and Maurice R. Todd was dissolved on October 19, 1894, since which time he claims to have been in no manner interested in said Fillmore County Bank, or in any manner to have been connected with Julia F. Greenleaf or Maurice R. Todd; nor had he any knowledge of or connection with said banking business after said date.

"Plaintiff at the time said bank closed its doors held four several certificates of deposit issued by said bank, and some twenty-two other parties likewise held certificates of deposit issued by said bank; and the Bank of New Richland had also deposited with said Fillmore County Bank several thousand dollars in open account, subject to check in the usual course of banking. The plaintiff procured from all of these parties assignments of their respective demands, and brought this action to recover the sum thereof, which aggregated $24,292.75. Each and every of these deposits were made subsequent to October 19, 1894, none of them being earlier than March 15, 1895; and each and every of said certificates of deposits were issued and signed by 'Greenleaf & Todd, Bankers.'

"The cause was tried to the court without a jury, the chief bone of contention being whether or not the defendant Clements continued to be a member of said copartnership. The court found against the contention of defendant Clements, and found that he was a member of the copartnership from its commencement until it ceased to do business, and ordered judgment for the plaintiff as demanded in his complaint. Judgment was entered upon said findings September 15, 1899, and from such judgment the defendant Joseph R. Clements brings this appeal. The evidence at the trial consisted largely of drafts, certificates of deposit, numerous entries in the books of account kept by the bank," (the original exhibits being produced for our inspection at the argument here).

A large number of assignments of error have been made, but

counsel have grouped them with great success, and they may be considered in the same manner.

1. Several of these assignments go to the sufficiency of the evidence to support the finding that there was no dissolution of the copartnership in 1894, as claimed by counsel, and also that the pretended withdrawal of Clements in November of that year was a sham, and was made for the purpose of cheating and defrauding present and future creditors of the bank. The latter part of this finding, with respect to the purpose of the pretended withdrawal of Clements from the previously existing firm, is made the subject of a special assignment of error; and, to dispose of this point, it is well to say at this time that if the main finding, as to the continuance of the copartnership down to the day of the collapse in August, 1898, was sustained by the proofs, the motive which prompted Clements to pretend to withdraw in 1894 is of no consequence, and the finding as to his purpose becomes immaterial. We therefore pass to a consideration of the evidence, some of which Clements' counsel insist was inadmissible, upon which was based the principal finding of fact.

Four days after the bank failed, Todd was arrested and incarcerated in jail. He was there confined when he testified as the plaintiff's chief witness in this action. His story as to the manner in which the funds of the bank were abstracted by Clements before and after the alleged dissolution, and in fact corroborated and conclusively established by documentary proofs, was remarkable, although not without its duplicate in these days, when an attractive sign on the outside of a building, a finely-finished counter, and a few blank books on the desks inside, seem to be all of the capital needed in order to start a bank, and all that is required to establish men of good address in position to "confidence" and swindle the people in almost any community. Todd's testimony was that, from the beginning to the end of this financial enterprise, Clements was one of the firm, and that the written notice of dissolution executed October 19, 1894, by the three persons who had previously been copartners, and the two receipts,—one dated October 25 of that year, and the other March 12, 1896,—in each of which Todd, in behalf of the firm of Greenleaf & Todd, acknowledged full payment

of all claims and demands against Clements, were devised, signed, and delivered as a part of the scheme previously concocted to loot the bank.

Clements and Todd were traveling dentists prior to 1886. They first became acquainted in 1858, when boys, and had always been intimate friends. Mrs. Greenleaf, a widow with some means, was Todd's mother-in-law, and lived in his family. When the copartnership was formed, and the bank started, all three of the partners moved to Preston from La Crosse, Wisconsin, and there made their residence. Mrs. Greenleaf, who seems to have had great confidence in Todd, contributed $11,500 of the bank capital, Todd about $3,000, while Clements, although posing as a capitalist, contributed nothing but his presence occasionally behind the counter. Todd was the active manager.

Soon after the execution of the notice of dissolution, Clements removed to his former home, La Crosse, and, according to the testimony, never returned to Preston, although living within 50 miles,— about two hours' ride by rail. The notice of dissolution, composed as if for publication, was never published. In newspapers issued for the use and benefit of banks and bankers, it was stated that Clements had withdrawn from the firm; and the words "Greenleaf & Todd, Bankers," were thereafter stencilled upon blank drafts, certificates of deposits, and stationery then on hand. Business was continued after Clements removed about as before,—obtaining money on deposit, and issuing certificates bearing a good rate of interest. There were some open accounts, and among them one with the "Bank of New Richland," which seems to have been organized by Clements in December, 1894, and transferred by him to the firm of Cramm & Fish in March following. This firm continued the account, and had quite a sum of money to their credit when the Preston bank closed. It is obvious from an examination of the books that both before and after the alleged dissolution the funds of the last-mentioned concern, the Preston bank, were not used in legitimate banking, but were regularly and gradually taken and placed out of sight.

This brings us to Todd's explanation of the methods adopted to accomplish this, prior to the alleged dissolution. He testified that

the money was taken, largely, by means of drafts made payable to Clements' order, and also in cash; entries being made in the books, true as to the amount taken, but false as to the stated purpose or use for the money. Turning to the books, the witness called attention to a large number of entries which had been tampered with, where erasures had been made of names, and other names inserted in lieu thereof. His assertion was that these mutilations, erasures, and changes were made by himself, sometimes assisted by Clements, in pursuance of a plan adopted, upon Clements' solicitation and suggestion, "many months," as he expressed it, before the latter ostensibly retired from the concern, and that they consisted principally in removing Clements' name by means of chemicals furnished by him, and inserting in place thereof Todd's name; the plan and scheme being to remove from the books all evidence of charges to Clements on account of moneys had by him and all evidence that he had habitually taken money belonging to the bank. Certain it is, from a close examination of a number of these entries, that an attempt was made with chemicals to remove Clements' name as the recipient of the funds of the bank, and to substitute Todd's name instead. It was also shown beyond question that the name originally written as the debtor's in many other entries of a like character had been fully erased in the same manner, and Todd's name inserted. The latter testified that all of these changes were made in pursuance of the plan, and in anticipation of Clements' pretended retirement from the firm, and, with two or three exceptions, —accidental omissions,—were made before such retirement.

A casual examination of these books will convince any person that these alterations were made, and it must follow that the motive or purpose was not an honest one. If, without contributing a dollar to the capital of the concern, and without rendering services for which it was agreed that Clements should be compensated, or for which he was entitled to compensation, we find that he was habitually drawing out money, the natural inquiry would be: For what purpose was the money taken, and why? Was it an honorable transaction, or did the party intend to plunder the depositors? If his intention was to loot the bank, would the scheme be facilitated, and his escape from personal responsibility be made more certain,

by the removal of all entries in the books which indicated that he had received large quantities of money unlawfully and fraudulently? If it was agreed between himself and a partner, already a party to the nefarious enterprise, that within a short time the active man in the scheme should pretend to withdraw from the firm, to discontinue, apparently, all connection with the business, and to remove to another town, when, as a matter of fact, he was to remain as much a member of the concern as he had ever been, and was to continue his depredations upon a different plan,— would the alterations in the books we have mentioned aid and assist him in escaping detection when the end was reached? Surely they would, if skilfully done; and Clements' name in connection with these entries was completely erased. And the fact that the attempt was made, with more or less success, was corroborative of the oral testimony as to the motive and purpose of the interested parties.

Such testimony also tended to corroborate Todd's statement as to the real facts concerning the alleged dissolution, and the exact relations of these parties thereafter. And there was further testimony tending to corroborate Todd. He testified that as part of the scheme which led to expunging, as far as possible, Clements' name from the books of account, drafts upon other banks, which had been issued to him prior to 1893, which bore his indorsement, and on which he had received the funds of the Fillmore County Bank, had been destroyed, and that it was the intention to destroy all drafts of this nature which, after being paid by the drawee, had been returned to the drawer, the defunct bank. But there were produced at the trial, having been found among the papers of the bank, 36 of these cancelled drafts, all of which were drawn upon other banks by Todd himself, and nearly all of which were made payable to Clements and bore his indorsement, having been collected through a bank at La Crosse. Of these, eighteen were issued in 1893, and all but three were made payable to, and had been indorsed by, Clements. These three (a total of less than $25) were made payable to other parties, in payment of Clements' bills, according to Todd. These 1893 drafts amounted in the aggregate to more than $1,900. Seventeen of these drafts were issued in 1894; the total thereof being nearly $1,800, and all but one made payable

to Clements, and indorsed by him, nearly all to the La Crosse bank before mentioned. One for $8.85 was made payable to the order of a third party, one of Clements' creditors, according to Todd. And the last of these drafts was dated March 4, 1895, for the sum of $700, payable to Clements, indorsed by him, and collected by the same bank at La Crosse.

It may also be noted here that one of the 1894 drafts, for $200, was dated October 19,—the day on which the dissolution notice bore date. After this (November 10) a draft for $100 was issued, and still later (March 4, 1895, as before stated) came the $700 paper. When issuing these drafts, Todd resorted to various subterfuges in order to conceal their real payee; the object evidently being to keep Clements under cover when trouble came. They show conclusively that, of the funds of the bank, Clements converted to his own use nearly $4,000 in 1893 and 1894, and that after the purported dissolution he received in the same way $800. In conclusion, on this branch of the case, we wish to again call attention to Todd's testimony that Clements originated the scheme to abstract money in the manner in which it was taken, and aided in making the alterations in the books.

We now come to the operations after the paper dissolution, conducted on a different plan. Clements kept away from Preston, but Todd made frequent visits to him at La Crosse; usually going there two or three times a month, and carrying currency in his pockets, which was delivered to Clements. To account for the disappearance of this currency, he charged it up on the books to various items of expense and to fictitious parties. The bank failed to open its doors on Monday, and on the Saturday evening before Todd made a clean sweep, taking all that was left ($195), and, going to La Crosse, made his final deposit with Clements. Todd's estimate of the amount appropriated by Clements prior to October 19, 1894, was $30,000. His estimate as to the amount taken after that date was $10,000. And the books of account fully justify the statement that these amounts were taken by one or both of these men. Todd confessed himself to be a criminal, and that he became such deliberately. He stood before the court below, and told the story of his shame in a clear and apparently straightforward manner, sparing himself not at all.

Although insisting when testifying that Clements received all of the money, Todd took upon himself a full share of the responsibility, and in no manner did he attempt to diminish the enormity of his own offense at the expense of his associate. He was subjected to a most severe cross-examination by astute counsel, but at no time was the apparent truthfulness of his version of the transaction affected. His verbal assertion as to the manner in which the money was taken out of the bank's funds, and as to the methods pursued to put it into the possession of his accomplice, Clements, was supported by proof of the original entries in the books of accounts and by the drafts we have mentioned. And this testimony, oral and documentary, tended to show that the relations of Clements to the bank and to Todd and Mrs. Greenleaf remained the same after the paper dissolution as before, and that he was just as much a member of the firm up to the time of the failure as he had been at any time previous. That it also proved him to have been a scoundrel, engaged in wrecking the firm and the business, detracts nothing from the foregoing assertion.

We are of the opinion that upon Todd's testimony and the corroboration hereinbefore mentioned the court below was justified in making the finding in question. And, when considering the weight to be given Todd's statements as they appear in the record, we must not overlook the fact that the trial court saw the self-condemned witness when he was testifying, and could much better judge of his truthfulness than can any one who reads his story in print. But this finding was not wholly based upon Todd's statements. Two witnesses testified that after the pretended dissolution, and after Clements had removed to La Crosse, he told them, in substance, that he was still connected with the Fillmore County Bank, and that he was out of the firm only in form. From what seems to have been his connection both before and after he removed to La Crosse, it is apparent that he was more truthful than discreet when making these statements.

And there is another feature of this case to be considered when weighing the evidence. Clements' testimony was taken on deposition at La Crosse. He testified as to the dissolution in 1894, identifying the notice thereof before mentioned, and as to some matters

of routine in the bank. He also denied making the statements as to his continued connection with the firm. But at no time, nor in any manner, did he deny Todd's statements as to the purloining of the money for his benefit, and its conversion by him. He wholly refrained from denial or explanation, although, as before stated, he resided but 50 miles from the place of trial. This is a circumstance which might, and probably did, have its influence with the court below when it considered the value of Todd's testimony.

2. We will now consider such of the other assignments of error as are, in our opinion, deserving of comment. Counsel are certainly mistaken when saying that "the whole of Journal A" was received in evidence. The offer was as to that part of the journal which showed an account with Clements. But even this method of showing the entries under his name was abandoned, and thereafter counsel proceeded as they had theretofore,—by calling Todd's attention to each entry.

3. What has been said as to the relevancy of proof of entries upon the books prior to the alleged dissolution originally made against Clements, but altered in pursuance of the schemes to defraud, disposes of assignment numbered 19. This evidence, as did other evidence produced and received, tended to show the general plan of fraudulent operations, which, among other things, included a pretended dissolution, and the execution and delivery of false receipts.

4. Todd was permitted to state that the money covered by the 1893 and the 1894 drafts was taken by Clements as one of the firm, and was not drawn out or received by him as a loan; and counsel insist that the question which elicited the statement was objectionable, because it called for the witness' opinion. We think not, for the inquiry was simply as to a fact. It may have been a superfluous question, for it was undisputed that Clements was not hiring the money as a customer of the bank. He was taking it as one of the firm, in pursuance of a deliberate plan to appropriate the deposits about as rapidly as possible, and keep the concern going for a few years. Nor was there any error in permitting the witness to testify that Clements' promise to return the money was merely verbal, and never in writing.

5. Mrs. Greenleaf's testimony was taken by deposition in another

action, but it was stipulated by counsel that in so far as it was competent, relevant, and material, it might be used on this trial. She testified that on one occasion Todd told her that "he had got rid of Clements," this being about the time the latter removed to La Crosse. On the cross-examination, defendants' counsel propounded certain questions, which Mrs. Greenleaf answered; such questions and answers being as follows:

"Q. You understood, after Mr. Todd told you that he had got rid of him, that he had got rid of him for all purposes? A. Why, I supposed so. Q. And you understood that he had separated from him in every way? A. I took it for granted. Q. Took it for granted that he had separated from him in every way, did you? A. Yes."

This subject was taken up by plaintiff's counsel on the redirect as follows:

"Q. Mrs. Greenleaf, in answer to the attorney's question you stated that, by Mr. Todd's remark to you that he thought you had got rid of Mr. Clements, you stated that you understood that you had got rid of Mr. Clements in every respect? A. Yes. Q. Now, did you mean that as to your business matters and as to your social matters?"

When the question last quoted was propounded to the witness, defendants' counsel objected, and the objection appeared in the deposition in these words:

"Objected to as repetition; and, second, it is offered to get the witness to contradict her own evidence, and is a leading question."

When reading this deposition to the jury, defendants' counsel withdrew the objection, and proposed to read the answer, "for all purposes," to the last question, whereupon the court, against the protest of defendants' counsel, allowed the question to be withdrawn, and, of course, excluded the answer. These rulings are assigned as error.

As an abstract proposition, we are not satisfied that the court below was right; for it would seem that, if counsel making the objection chose to withdraw it, they should be entitled to the benefit of the answer to the question. If the witness had been examined in court, and defendants' counsel had interposed the same objection

to this same question, and had then withdrawn such objection, and the question had been answered, it would have been beyond the power of plaintiff's counsel to withdraw the question, and thus deprive defendants of the benefit of the answer. Although the case is not directly in point, see Watson v. St. Paul City Ry. Co., 76 Minn. 358, 79 N. W. 308. But, if there was error in these rulings, it was entirely without prejudice, because Mrs. Greenleaf had already testified that she understood from what Todd said that he had gotten rid of Clements "for all purposes," and had separated from him "in every way." The question and the answer were mere repetitions.

6. We have considered much of the evidence discussed under assignments of error from 118 to 121, inclusive, and do not care to repeat. These assignments simply involve the finding that the copartnership was not dissolved in October, 1894. But we will at this time briefly allude to the contention of counsel, made in this connection, that because Mrs. Greenleaf, one member of the original firm, knew nothing of the arrangement between Clements and Todd under which the notice of dissolution was signed, the subsequent receipts executed, and other steps taken to conceal the real facts, and because she supposed that Clements was no longer a member of the firm, that, as a matter of law, he could not be, and was not, such member, and that at most there was nothing more than what is termed a "subpartnership" between Clements and Todd after the pretended dissolution.

From an examination of Mrs. Greenleaf's evidence, it conclusively appears that she placed implicit confidence in Todd, and left to his management and control her interests in the concern. He acted for her in everything that was done, and she knew nothing of the business transactions. She signed upon his request, and without examination, all papers laid before her. She stated that she never talked with Clements about a dissolution, knew nothing of it at the time it is alleged to have taken place, and positively denied that she signed the notice thereof, in which her name appeared with the names of Clements and Todd. Under these circumstances, there is no merit in the position taken by counsel. It is plain that Clements continued to be a partner, as to Mrs. Greenleaf, if at any

time after October 19, 1894, he occupied a partnership relation of any kind towards or with his previous associates.

7. We do not deem it necessary to discuss other assignments of error. In our opinion, they are devoid of merit.

The judgment is affirmed.