STATE v. JOSEPH R. CLEMENTS.[1]

February 11, 1901.

Nos. 12,378—(13).

## Deposit in Insolvent Bank—Laws 1895, c. 219.

Under the provisions of Laws 1895, c. 219, which makes it a felony for any one connected with a banking concern, either public or private, to receive deposits while such institution is insolvent, it is not material in what capacity the accused party is connected with the bank,—whether as an ostensible partner, or as a secret conspirator with the actual operator of the same,—provided any substantial aid is given by him tending to violate the statute.

## Liability of Former Partner after Sham Dissolution.

A former dissolution of a banking firm cannot control the subsequent

[1] Reported in 85 N. W. 234.

responsibility of the former partners if it is executed as a sham to relieve one of them, nor exonerate the retiring partner from full accountability for subsequent acts in an unlawful plan to receive deposits during the insolvency of the bank. In such a case the dissolution should be treated as an illegal and fraudulent device.

## Books of Account—Evidence of Expert.

When books of account, which are material to an issue on trial, are properly received in evidence, and, being in court, open to inspection by all parties, require a long examination of many details, it is proper to receive balances or summaries from an expert witness, who has made the same, upon proper foundation being laid.

## Evidence of Conspiracy.

Evidence of a continual depletion of the resources of a bank partnership, continued for several years, is competent upon the question whether an unlawful scheme existed to wreck the concern in failure, and as showing a motive for a sham dissolution, whereby one of the partners could withdraw therefrom a portion of its funds.

## Corroboration.

No person can be convicted upon the uncorroborated testimony of an accomplice, but such corroboration is not required to be sufficient, independent of the evidence of such accomplice, to establish all the elements of the crime charged, but should tend, in some degree, to show the guilt of the accused.

## Evidence of Accomplice.

Evidence in this case considered, and applied to the testimony of an accomplice showing that there was sufficient corroborating testimony independent of the evidence of such accomplice (whose confessions as a witness at the trial, if believed, established the guilt of defendant) to warrant the submission of the case to the jury under the rule laid down in State v. Lawlor, 28 Minn. 216, which is approved and followed.

## Charge to Jury—Insolvency.

Alleged errors in the charge of the court defining insolvency considered, and *held* to be without prejudice to the defendant, while the remaining assignments are not of sufficient merit to require specific mention.

Defendant was convicted in the district court for Houston county of having, while engaged in the private banking business, as member of a firm doing business under the name of the Fillmore County Bank, received a deposit knowing the bank was insolvent.

From an order, Kingsley, J., denying a motion for a new trial defendant appealed.    Affirmed.

Losey & Woodward and Webber & Lees, for appellant.

W. B. Douglas, Attorney General, John W. Hopp, County Attorney, Brown & Abbott and S. H. Somsen, for respondent.

LOVELY, J.

Defendant was convicted under Laws 1895, c. 219, of having, as a member of the banking firm of Clements, Greenleaf & Todd, operating the Fillmore County Bank at Preston, Minnesota, received a deposit of money from one Catherine K. Mack, knowing such bank to be insolvent.

The Fillmore County Bank commenced its operations at Preston in 1886.    It was a private concern (unincorporated), composed of the defendant, Julia F. Greenleaf, and Maurice R. Todd, who admittedly continued the partnership until October 19, 1894, when an agreement of dissolution was signed by the partners, under the terms of which defendant withdrew therefrom; the business subsequently, to all appearances, being conducted by the two remaining partners, under the firm name of Greenleaf & Todd, until August 20, 1898, when the bank closed its doors with nothing to show for large sums of money that had been previously intrusted to its keeping by depositors.

A scrutiny of its books disclosed the fact that it had been insolvent for some time.    It was the claim of the prosecution that the dissolution agreement of October, 1894, was in furtherance of a fraudulent scheme between Todd and defendant for the purpose of having the latter retire from the business while it was insolvent, to cover up unlawful withdrawals of large sums, which had placed the bank beyond the hope of financial recuperation by any legitimate business methods, which design was unknown to Mrs. Greenleaf, who signed the dissolution agreement in good faith; that subsequent to the paper dissolution defendant continued to withdraw substantial sums of money from the bank, which further depleted its assets and increased its insolvency, until the crash came; and that by reason of defendant's participation in this fraudulent scheme he became criminally accountable, under the terms of the statute upon which he was indicted, for

the acts of Todd, his co-conspirator, who personally received the deposit from Mrs. Mack while defendant himself was at La Crosse, Wisconsin.

In a civil action brought for depositors against the three partners, previously before this court (Utley v. Clements, 79 Minn. 68, 81 N. W. 739), an extended history of the Fillmore County Bank is given, and we shall here refer to its operations disclosed by the record no further than necessary to dispose of such assignments of error as we deem of sufficient importance to be considered on this review.

Defendant resided at all times at La Crosse, Wisconsin. Until the dissolution agreement in 1894, he visited Preston frequently, remaining there at times several days, and joined in the direction and management of the business affairs of the bank. For a while he assumed to act as president, while Todd was cashier. This ostensible designation of the name and officers of the bank was continued for some time afterwards, until such use of the same in conducting a private banking business was forbidden by law. The business continued under the firm name of Clements, Greenleaf & Todd up to the time of the dissolution referred to. No announcement of the dissolution was given out in local papers, nor was any effort made to publish the same to the people who were directly intrusting the bank with their funds. The old bank stationery of Clements, Greenleaf & Todd was used until April, 1895, when a stencil stamp, "Greenleaf & Todd," was procured, and applied to the printed blank forms used by the former firm. When the bank closed its doors, Todd was arrested, and after several days' confinement confessed that he had been a party to a systematic scheme adopted by defendant and himself to withdraw gradually the funds of the depositors, and place them in defendant's hands in an unlawful trust for both; that, except such sums as Todd and Mrs. Greenleaf had used for the simple necessities of life, the balance of such withdrawals had been put for fraudulent purposes into defendant's hands. From this time Todd became an assistant of the state, and testified against the defendant in the present action to matters which, if believed, conceded his own infamy in the effort to convict the defendant of the

crime charged. He also gave testimony in civil and criminal suits growing out of the failure and wreckage of the bank.

It is proper to say in this connection that the result of the different investigations growing out of this unfortunate affair relieve Mrs. Greenleaf, who was the mother-in-law of Todd, of any guilty knowledge or participation in the transaction, which absorbed her own little fortune, and doubtless hastened her death. No trace of suspicion, discreditable action, or bad motive can be fastened upon any member of the Todd family, save Todd himself. Mrs. Greenleaf was a simple-minded elderly lady; no doubt a victim of overconfidence in her son-in-law, whom she trusted implicitly. This statement is due to her memory.

It must be conceded that without the testimony of Todd the evidence would not be sufficient to sustain the verdict. His story is a remarkable one, for it exhibits an ignorance of correct business methods, a depth of cold-blooded depravity on the part of the alleged conspirators, a blind submission by Todd as a tool of defendant, and an apparent overweening confidence in his partner in crime that amounted to infatuation in the belief that he who was defrauding every one else might safely rely upon his alleged fellow knave in craft and guilt; but the exhibition of such inconsistencies are not uncommon in the annals of crime. We are often apt to look for too much wisdom and common sense in the behavior of those who attempt to succeed by criminal methods. There is but one safe course in life,—the honest one. All knaves are in a large measure fools; and, while some statements made by Todd seem incomprehensible if tested by the rules that govern honest men in their business relations with each other, yet such are the common indicia and characteristics of peculation and fraud among those who set the safeguards of justice at defiance.

According to the story of Todd, which we must adopt in this narrative to give expression to the facts found to be true by the jury, the largest part of the capital of the bank at its organization was used in the purchase of a lot, building, vault, safe, and the general outfit usual in a country bank. From this time forward until the Mack deposit, June 17, 1895, the legitimate earnings of the bank during some thirteen years amounted to no more than

$8,400, while the disbursements during the same period amounted to $62,000. During that time there was turned over to defendant $35,000 in round numbers. After this, and before the date of the collapse, there was also turned over to defendant more than $10,000, which he received and used in furtherance of the unlawful conspiracy. It is not claimed that Todd was extravagant; and while he, when first arrested, insisted that he lost money in wheat speculations, according to his subsequent statements this story was told to shield defendant, and no proof of any speculation by Todd has ever been brought to light; but there appears upon the books of the bank kept by Todd, or under his direction, evidence of a continued depletion of its funds, which absorbed over $70,000 of money deposited during the years of its operations, until all its avails, when it closed its doors, had entirely vanished from the sense of sight and touch. What the secret hopes, motives, or plans of the admitted criminal Todd may have been must, to a certain extent, be left to conjecture. By the verdict the jury undoubtedly accepted his story, and, so far as the weight of evidence to sustain the verdict is concerned, if his evidence was sufficiently corroborated, it cannot be disturbed on this review.

It must be conceded that it was essential to show by competent evidence that Clements' connection with the Fillmore County Bank subsequent to the paper dissolution of October, 1894, and at the time of the Mack deposit, was an actual fact. It is urged very earnestly in behalf of the defendant that the legal effect of this dissolution, which was in all respects legal in form, was to dissolve such partnership in law, and that a prosecution cannot be based upon the relation of Todd and Clements afterwards, unless a legal valid partnership is established of the time of such deposit, to which the formal dissolution is a complete bar.

The statute under which this prosecution was instituted is very broad and sweeping. It covers every relation between the person actually accepting the deposits during the insolvency and any one who directly or indirectly co-operates with him in that act, and, if any technical distinction can be made which allows a dissolution of a partnership on paper for the purpose of committing a crime, or permits the spirit of the statute to be evaded by such a

subterfuge, a new maxim in jurisprudence must be adopted to sanction an outrageous legal solecism that offends justice and common sense. It does not appear to us to make any difference what Todd and Clements agreed to call the business they were prosecuting, or what others called it. If the Fillmore County Bank was being operated after October, 1894, for the purpose of receiving deposits, when, within the knowledge of both conspirators, it was insolvent, and they were both interested in criminally deriving benefits from such deposits, they must each be held criminally liable under the statute, whether we call them partners, coconspirators, or principals in the commission of a common crime. At any rate, it is enough to say that under every contention, if Todd's story is true, both he and the defendant were violating the law upon which this prosecution rests. The fact that Mrs. Greenleaf, innocent of any wrong herself, signed this agreement of dissolution in good faith, cannot change the criminal relations of the two guilty persons who adopted the scheme and used the paper dissolution to rob and defraud her, as well as others. The law will not permit such a dishonest and shallow trick to defeat justice of its due. This was, in effect, so decided in the case of Utley v. Clements, 79 Minn. 68, 81 N. W. 739.

According to the testimony of Todd, the bank's books correctly and truthfully disclosed its actual cash transactions except with reference to certain erasures and changes which he claimed had been made during a period of the operations of the bank, when, at the request of defendant, he removed the latter's name where upon the books themselves (received in evidence and exhibited here in court) it was shown defendant's name had originally appeared, and wherein defendant was at first charged with funds which had been paid over to him at stated intervals as a part of the felonious misappropriations of the depositors' money above referred to. According to Todd's statements, defendant seemed to have been the dishonest custodian of the stealings from the bank. To cover this up, and divert attention from defendant in case of anticipated failure and an examination of the books, defendant requested that, where he had been charged with money, his name should be erased, and other names and charges substi-

tuted. He obtained chemicals for that purpose, and the books were deliberately mutilated by Todd to accomplish that result so effectively as to remove all traces of defendant thereon except in several instances where his name accidentally remained.

After these mutilations, which occurred in 1888,—six years prior to the dissolution and ten years before the failure,—no charges were made on the books of moneys turned over to defendant; but by a peculiar system of bookkeeping much of the money that went to defendant Todd charged to his mother-in-law, to real-estate and other fictitious accounts upon the journals, but distinguished from the money which he and Mrs. Greenleaf actually received by making an account of the latter upon the deposit ledger. One explanation to account for the entire submission of Todd to the will of Clements after he had once submitted to his overpowering influence in the corrupt withdrawals is that they together owned Minneapolis real estate standing in the name of Clements, which in case of business failure was to be protected. With this in view, for quite a period before the paper dissolution this scheme was talked over between them, and that reason was given by Todd at the trial for the ostensible retirement of Clements from the firm.

An expert accountant was permitted to take the journals, and, referring to such portions as were properly introduced in evidence, allowed to give summaries of the amounts, properly classified, upon the claims of the state. This evidence was objected to. We do not find that any original evidence thus introduced upon which summaries were based was improper. These summaries could have been made by counsel or by the jury. It would have taken an unusual length of time at the trial to do so, and it is only an incident of everyday practice in courts, where long arrays of figures and accounts are open to the inspection of the court, jury, and counsel, to use the assistance of a competent accountant to give the tabulated results that such evidence would disclose; and it is perfectly proper to do so. Either side can have the advantage of such evidence and usually come prepared to detect any errors of calculation so made. Indeed, it is not now an open

question in this court that such a course is proper. Wolford v. Farnham, 47 Minn. 95, 49 N. W. 528.

Admitting that the testimony upon which these summarized results were given was proper, it has not been pointed out that any errors in estimation were committed, and we see no reason to criticise the conduct of the trial court in this respect. It will appear in disposing of this question that the books were not used as original evidence of any charges or facts that transpired after the so-called dissolution, and so far as they were kept by Todd, and depended upon his own unsupported testimony without the corroboration furnished by other evidence, they were open to proper criticism; but it does appear, however, that they were constantly inspected by defendant, and were continually examined by him during his admitted connection with the bank. Assuming that the dissolution in October, 1894, was a sham and fraud, and that Todd and Clements were guilty partners or conspirators in a scheme to withdraw the funds of the bank and defraud the depositors, the erasures and mutilations of the books which transpired in 1888, followed by a change in the plan of making charges against Clements through false names (but of correct amounts), depending upon keys mutually adopted for that purpose, such evidence of changes and false entries was proper and competent for two reasons: First, upon the issue of the anticipated insolvency of the bank, for this evidence would tend to show an unlawful depletion of its funds, and was calculated to bring the knowledge of insolvency directly to the defendant; second, it would tend also to establish the illegal intention of the defendant in making the sham dissolution to cover up his subsequent connection with the bank.

From the examination we have given the whole evidence in this case, we must say, as a preliminary consideration to the essential necessity of corroboration of Todd's testimony, that his evidence, were it unimpeached by his legal position in the case as an accomplice and the confession by him of equal participation in the guilt of the defendant, embraces every essential element of the crime charged. But Todd's testimony is not alone sufficient to

convict the defendant.   It is a wise and wholesome provision of our statute that

"A conviction cannot be had upon the testimony of an accomplice, unless he is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."   G. S. 1894, § 5767.

While the corroborating evidence must be such as tends to show some connection by defendant with the criminal acts complained of, yet all the guilty elements of the crime testified to by the accomplice need not be supported by corroborative evidence. We think no court has gone to this extent under a statute similar to our own.   This court in a very well-considered case gave an interpretation to this statute which we think reasonable, and should be followed, unless it is concluded wise to dispense with the assistance of accomplice evidence in any case.   It was held in State v. Lawlor, 28 Minn. 216, 224, 9 N. W. 698, 702, that:

"A reasonable construction of this section does not require a case to be made out against the prisoner sufficient for his conviction before the testimony of an accomplice can be considered, for that would make it available only when its necessity did not exist; neither do the terms used require such an interpretation. The corroborating evidence must, independently of the testimony of the accomplice, tend in some degree to establish the guilt of the accused, but need not be sufficiently weighty or full, as, standing alone, to justify a conviction,"—citing People v. Ames, 39 Cal. 403; Montgomery v. State, 40 Ala. 684; Craft v. State, 3 Kan. 450.

The question of the sufficiency of the corroborative evidence in this case is the most serious issue involved on this appeal, and has required and received from us a careful scrutiny of the whole record.   We will not attempt an exhaustive review of the various features of the evidence which, independently of the testimony of Todd, confirmed his statements of defendant's criminal acts; but we deem it our duty to call attention to sufficient matters of corroboration of the story of Todd, found in the record, to satisfy the requirements of the statute.

The testimony of Harry Grattan, who was a bookkeeper in the bank during the year 1888, to the effect that some three months

of that time he was absent from Preston; that on his return he discovered in the bank journals numerous instances where defendant's name had been erased by chemicals, and Todd's name had been inserted in place thereof, as well as indications of changes in other respects, which he was able to point out on the trial; that he saw many times afterwards the defendant handling and examining the books is corroborative of Todd's evidence. Erasures and changes of entries in regular books of a bank would not be made, probably, for any honest purpose. Such an extended number of changes as he thus indicated would tend to show a system and evident purpose of fraud, and the fact that the person who was interested in such changes continued to inspect the books would have a strong tendency to show his intimate knowledge of the same.

This testimony also tended to show a withdrawal of a large and unusual sum of money in the aggregate, which had a direct influence towards the insolvency of the bank, and the subsequent conditions which led to its collapse. According to the books the condition of the bank never changed for the better, and continued to grow worse from evil beginnings until at the time of the failure over $70,000 had been taken from the overconfident people of Preston and vicinity; and if, as it seems to us clear, the mutilations and erasures were competent evidence, the connection of this proof by a disinterested person, outside of the evidence of Todd, who mutilated the same, would seem to furnish an essential corroboration to the alleged guilt of defendant of reasonable probative force to entitle it to value in that respect, particularly as no explanations of the mutilations were given, nor has the bookkeeping of Todd been attacked in other respects than by the fact of such changes, and that he was a confessed criminal. Defendant was his partner for years, had access to the books during the whole time; and, while it is necessary to find evidence, beyond the explanation of the facts given by Todd, to convict the accused, when that connection was disclosed the jury had the right to apply the usual rules as in other cases in weighing the testimony and, taking it all together, determining its value.

It appears also very singular that a dissolution of a banking

firm that was insolvent, if such dissolution were an honest transaction, where both partners were legally liable, should have been terminated as quietly as this, where the benefits of the dissolution were all on one side. We think this fact is of some corroborative force as to the question of the genuineness of the dissolution, which it would seemingly be in the interest of defendant to have made public as soon as possible.

In the evidence of Todd he stated that at Clements' request (to carry out the criminal designs of both) he hid all connection of the defendant's name with the business transactions of the bank in defendant's withdrawal of its moneys. To do this he had destroyed a large number of drafts, through which means he had turned over funds from time to time to defendant. Most of these drafts were destroyed by Todd at defendant's request; but quite a number, previous to the so-called dissolution, and one subsequent thereto, were overlooked, and were found and produced in evidence, with Clements' indorsement, proved outside of Todd, thereon. Most, if not all, of them were for the amounts and of the times when Clements' name had been erased with the aid of chemicals upon the bank journals. In connection with Grattan's evidence we think this is very convincing evidence of the fact that Clements received this money, and we cannot imagine any good reason why he should have been willing that the evidence of such receipt of money by him should be hidden by fraudulent entries on the books, or that the drafts should be destroyed; but those which still remained were certainly evidence of defendant's abstractions, and did not depend upon Todd's veracity for their accusing weight and effect.

Again, while defendant visited the bank at intervals before the dissolution agreement of 1894, it is claimed that after this, under the theory of the prosecution, defendant purposely remained away from Preston to give color and effect to the alleged sham dissolution. During this time Todd states that he repeatedly carried the funds of the bank to La Crosse, and delivered them to defendant, to the extent of $10,000 in the aggregate, and that the Saturday when the bank closed he carried the last dollar of the bank's money (about $200) to La Crosse, and gave the same to defendant.

The wife of defendant claims to have been present at an interview between Todd and her husband at this time, and her account of the same at the trial differs radically from that of Todd. She states that Todd had visited her husband several times after the dissolution. Why he should have visited him, what his purpose could have been in doing so, are matters of inference, but certainly tend to show a continued confidential relation between defendant and Todd reconcilable with Todd's theory, although not of the most convincing weight, but tending, in some degree, to support the claim of the prosecution in that respect. She states that at the last interview Todd wanted money from Clements to tide over the affairs of the bank and keep it running, that he stated he could run it no longer without help, and that Clements told him to "go back and face the people he had robbed." Todd's account of the interview is that he wanted money, that Clements declined to give it to him, and told him "to go back and face the people," without intimating that he or both had robbed anybody. There is no other place in the whole record where any indignation on the part of defendant towards Todd is exhibited, although the insolvency of the bank seemingly must have been known to defendant before the dissolution of 1894, when he was actively participating in the conduct of its business.

Again, two other unimpeached witnesses also testified that defendant made statements to each at different times after the dissolution agreement, but before the Mack deposit, that he was still connected with the bank. To one of them he said that he was "behind it." If such dissolution agreement was real, and meant to be in fact what it purported to be on its face, this was a most remarkable admission, for in a slip of the tongue, or in an unguarded moment, the guilty mind, oppressed by its burden of suppressing the truth, disclosed a fact which prudence would have withheld, and in "its web of snares strangled its own intent." We conclude that we have pursued the subject of Todd's corroboration far enough to show that in this case the conviction does not rest solely upon the testimony of an accomplice, but has that support which, under our statute, as construed by this court, made

the weight of the whole evidence a question for the jury, and forbids us to disturb the verdict on that ground.

Complaint is made of the charge of the court with respect to its definition of insolvency. Such instructions embraced in the charge an abstract proposition of law, but, under any definition required in commercial or criminal cases, we think the charge of the learned trial court was sufficiently favorable to the defendant in this respect. The trial court, defining insolvency, said that the term "means inability to meet liabilities in the usual course of business." To this statement exception was taken. This is the exact definition given by this court under the insolvency law of this state. Daniels v. Palmer, 35 Minn. 347, 29 N. W. 162. This may, as an abstract definition, be too broad in its application to such insolvency as would fasten guilty knowledge upon the defendant in receiving the deposit of Mrs. Mack, but it was merely introductory to the further full and complete statement of the court in its charge upon this subject, and in immediate connection therewith, as follows:

"If the assets of a banking firm and of the individual members thereof are insufficient in value to pay the debts of such firm, then such firm is insolvent. A bank or banking firm is solvent, within the meaning of the statute, when it and its several members possess assets of sufficient value to pay within a reasonable time all its liabilities through its own agencies, and is insolvent when it and its individual members do not possess assets of such value."

Under any view of the test of insolvency and this definition of its meaning, under the evidence, the jury could not, taking the whole charge together, have been misled to the prejudice of defendant, and it was as favorable to the accused as could be required under any rule, and, in view of the whole record, and the entire charge, which was exceedingly clear and impartial, we do not see any merit in this exception.

Other assignments of error have been carefully considered, but are not found to be of sufficient merit to require specific notice.

The order appealed from is affirmed.