DODGE *v.* MASTIN.

*(Circuit Court, W. D. Missouri, W. D.* 1883.)

1. BANK—INSOLVENCY.
    A bank is solvent, within the meaning of the constitution and statutes of Missouri, when it possesses sufficient assets to pay, within a reasonable time, all its liabilities through its own agencies; and is insolvent when, from the un-certainty of being able to realize on its assets in a reasonable time a sufficient amount to meet its liabilities, it makes an assignment, by which the control of its affairs and property passes out of its hands.

2. SAME—"IN FAILING CIRCUMSTANCES."
    The phrase "in failing circumstances," used in the constitution and statutes, when applied to a bank, must be taken to mean a state of uncertainty whether the bank will be able to sustain itself, depending on favorable cr unfavorable contingencies, which in the course of business may occur, and over which its officers have no control.

3. SAME—RECEIVING DEPOSITS—KNOWLEDGE OF CASHIER—BURDEN OF PROOF.
In an action against the president, directors, cashier, or agent of a bank, under the act of April 23, 1877, for receiving a deposit knowing that the bank was insolvent or in failing circumstances, the plaintiff is only bound to prove to the satisfaction of the jury that the bank was insolvent. Upon this showing, the officers of the bank, to escape liability, must prove that they did not have the knowledge the law imputes to them, and thus overcome the law, which says they did know. The burden of proof of the want of knowledge of insolvency is on the officer sued.

At Law.

*Scott & Taylor,* for plaintiff.

*Karnes & Ess, Tichenor & Warner, Pratt, Brimback & Ferry,* and *L. H. Waters,* for defendant.

KREKEL, J., (*charging jury.*) An explanation is, perhaps, due to you for the delay that has occurred. The questions involved in this matter are questions pertaining to the constitution and, laws of the state of Missouri, and whatever may be the charges against the federal judges, they always seek to avoid a construction of the constitution and statutes of a state, because they recognize that, under our system of government, the people of a state are authorized, through their legislature, to fix their own laws; and the probabilities are that those who expound those laws are more familiar with their spirit than the federal judge can be. Although a resident among you, yet his examination of law does not lead him to the examination of the statutes of the state, but upon another field altogether; and hence, whenever we are brought face to face with the necessity of construing the constitution and statute law, the first thing we do is to look anxiously into the decisions of their own courts to learn the spirit of their laws. Under the laws of congress, and by the whole system of our government, an injunction is upon us to avoid the usurpation of anything that does not properly belong to us; and we seek, whenever there is an opportunity, to avoid the original construction of laws that belong to the state rather than to the federal government. In the matter that is now presented the constitutional provision, as well as the law passed under it, is of recent date. You all recollect that the constitution under which we live is only a few years old, and the laws passed under the constitution are still younger, and have had but little time to be reviewed in the state courts. Hence, during the time that you have been delayed here I have been laboring diligently that I might arrive at a proper construction of this law, and I ask your careful attention, as this is a matter of importance.

The issue you are required to pass upon grows out of a suit between Richard Dodge and Julia R. Dodge, plaintiffs, and John J. Mastin, defendant. In this suit between these parties it is claimed by the plaintiffs that by the wrongful act of John J. Mastin they lost $6,000, which was received on deposit in the Mastin Bank, of which the defendant, Mastin, was cashier when it was known to be insolvent and in failing circumstances. In this suit here spoken of an attachment

was obtained by the plaintiffs, and property supposed to belong to John J. Mastin, the defendant, was attached for the purpose of securing the debt. The laws of Missouri allow such an attachment upon plaintiffs giving bond to pay damages, if any are done, and require further that the plaintiffs, or some one for them, shall file an affidavit alleging the cause or grounds for attachment. The law requires the facts to be set out in the affidavit. The affidavit filed in this case, for the purpose of obtaining the attachment, states first that the debt sued upon was fraudulently contracted, but as this is not relied upon by the plaintiffs nothing further may be said of or about it. The second cause for the attachment, and the one relied upon by the plaintiffs, is that the defendant, as a director, stockholder, and as cashier of the Mastin Bank, a corporation organized and existing by authority of the laws of the state of Missouri, received the sum of $6,000 into said bank at a time when the same was in his knowledge insolvent, and in a failing condition, and by reason thereof said sum of money has been lost to plaintiffs. That is the allegation in the affidavit under which the attachment was obtained. The defendant denies the facts set out in the affidavit, and puts the plaintiffs to the proof of them; and the affirmation, on the one hand, and the denial, on the other, constitute the issues you are to determine. This is called in technical language a "plea in abatement."

You have nothing whatever to do with the original suit, and it is in no manner before you. The question for you to determine is, "Was the Mastin Bank, on the twenty-sixth of June, 1878, insolvent or not?" and, if so, "did the defendant, John J. Mastin, know it?"

The Mastin Bank was one of that class of institutions which have received the attention of the legislative department of the state of Missouri, and so important has this supervision been deemed that it has not been made a matter of legislative action simply, but the constitution of the state itself seeks to regulate them. Section 27 says:

"It shall be a crime, the nature and punishment of which shall be prescribed by law, for any president, director, manager, cashier, or other officer of any banking institution to assent to the reception of deposits, or the creation of debts by such banking institution, after he shall he shall have had knowledge of the fact that the bank is insolvent or in failing circumstances, and such officer, agent, or manager shall be individually responsible for such deposits so received, and all such debts so created with his assent."

—That is, the constitutional provision — the constitution of Missouri itself—makes it a crime for the cashier, or other officer of a bank, to receive deposits after knowing the bank is insolvent or in failing circumstances, and further provides that the officer receiving such deposit, or creating such debt, shall be individually responsible. Thus spoke the people of Missouri in their sovereign capacity through the convention of delegates elected by them, and whose action they subsequently ratified at the polls. The duty then devolved upon the general assembly of Missouri to enact a law to carry this constitu-

tion into effect, and the following law was placed upon the statute-book and was in force at the time the deposit in controversy was received by the Mastin Bank:

"No president, director, manager, cashier, or other officer or agent of any bank or banking institution organized and doing business under the provisions of this article, or of any law of this state, shall receive or assent to the reception of deposits, or create or assent to the creation of any debts, by such bank or banking institution after he shall have had knowledge of the fact that it is insolvent and in failing circumstances; and it is hereby made the duty of every such officer, agent, or manager of such banking institution to examine into the affairs of the same, and, if possible, learn its condition. In all suits brought for the recovery of the amount of any deposits received, or debts so created, all officers, agents, or managers of any such banking institution charged with having so assented to the reception of such deposit, or the creation of such debt, may be joined as defendants or proceeded against severally, and the fact that such banking institution was so insolvent or in failing circumstances, at the time of the reception of the deposit charged to have been so received, or the creation of the debt charged to have been so created, shall be *prima facie* evidence of such knowledge and assent to such deposit and creation of such debt on the part of such officer, agent, or manager so charged therewith."

This act was passed on the twenty-third of April, 1877. Under the provisions of this law the plaintiff, in the first instance, must show to your satisfaction that the Mastin Bank, at the time of receiving the deposit in controversy, was insolvent or in failing circumstances. Upon such showing being made, the law implies that the officers of the bank knew of its insolvency, but provides that such officers may show that they did not in fact know of the insolvency, or did not assent to the deposit made. As soon as the insolvency of the bank has been established, the law imposes on the officer sued the duty to satisfy you that he did not in fact know the insolvency of the bank, or did not assent to the receiving of the deposit. The plaintiff is only bound to show that the bank was insolvent. Upon this showing being made, the officers of the bank, if they desire to escape liability, must show that they did not have the knowledge the law imputes to them, and thus overcome the law, which says they did know. This is what is meant by the words *prima facie* evidence, used in the law read to you. The burden of proof of the want of knowledge of insolvency is on the defendant. There is no dispute as to the defendant, John J. Mastin, as cashier, receiving the deposits in controversy.

So far as I remember, there is no evidence before you of any change in the financial condition of the Mastin Bank between the day of the reception of the deposits, June 26, 1878, and August 3, 1878, when the bank failed. Nor is there any evidence that John J. Mastin, the defendant, had or obtained any more or different knowledge, between the day of deposit and the day of failure, regarding the financial condition of the bank, so that whatever he knew on the third of August, 1878, he had knowledge of on the twenty-sixth of June, the day the deposit in controversy was made.

The defendant, Mastin, while upon the witness stand, admitted that he knew all about the bank on the twenty-sixth of June, and for a long time prior to that time, and up to the day of the failure; that he knew the liabilities of the bank, and was acquainted with its assets. I do not remember of his testifying to any change affecting the solvency of the bank; nor did any other witness testify to any change of the nature and character spoken of between the twenty-sixth of June, 1878, and August 3d, the day the bank failed.

What, then, is the effect of the failure occurring under such circumstances on the burden of the proof regarding the solvency or insolvency of the bank? We may fairly turn, I think, to the crimes act of the statutes of Missouri as furnishing us a guide in the determination of this question. Section 1350 of that act provides as follows:

"If any president, director, manager, cashier, or other officer of any banking institution, doing business in this state, shall receive or assent to the reception of any deposit of money or other valuable thing in such bank or banking institution, or if any such officer or agent shall create or assent to, the creation of any debt or indebtedness by such bank or banking institution, in consideration or by reason of which indebtedness any money or valuable property shall be received into such bank, or banking institution, after he shall have had knowledge of the fact that it is insolvent or in failing circumstances, he shall be deemed guilty of larceny, and upon conviction thereof shall be punished in the same manner and to the same extent as is provided by law for stealing the same amount of money deposited, or valuable thing: provided, that the failure of any such bank or banking institution shall be *prima facie* evidence of knowledge on the part of any such officer or person that the same was insolvent or in failing circumstances when the money or property was received on deposit."

In order to arrive at the intention of the legislature in enacting laws pertaining to banks, it is proper to look at the whole of the enactments in order to discover their meaning and object. The law last quoted, taken from the crimes act, evidently proceeds upon the ground that the failure of a bank implies insolvency. The proviso proceeds upon this view, and is intended to enable an officer to show that he had in fact no knowledge of its financial condition, nor was he bound to have such knowledge by implication of law; or that, from the knowledge he had of the financial condition of the bank, he had good reason to believe the bank to be solvent. There is no pretension that the defendant, Mastin, had not full and complete knowledge of the financial condition of the bank. On the contrary, his position is that, knowing all about the bank, he believed it to be solvent. The law is held to be, and I so charge you, that the Mastin Bank, having failed to meet its liabilities in the usual course of business, thereby, in contemplation of law, became insolvent, and that defendant, Mastin, the cashier, knew of the insolvency when he received the deposit in controversy, and he is bound to overcome this legal presumption. There is no controversy as to the financial condition of

the bank between the day of deposit and the day of its failure being the same. If it was solvent on the day of receiving the deposit, it was solvent on the day when it closed, and *vice versa.* The defendant, Mastin, had the same knowledge of the financial condition of the bank on the day of receiving the deposit as on the day of failure. The law, as already stated, on account of its failure, treats the Mastin Bank as insolvent, and attributes to its cashier, the defendant, knowledge of its insolvency. The burden of proof to remove this presumption of law is upon the defendant, Mastin, and he must satisfy your minds that the bank, on the day when he received the deposit, was solvent. There is no controversy as to his not having the knowledge necessary to determine the solvency or insolvency of the bank.

I will proceed next to define the meaning of the word "solvent," and the phrase "in failing circumstances," used in the statutes and constitution. In the ordinary acceptation of the term, "insolvent," when applied to a bank, means inability to meet liabilities in the usual course of business. But a bank may be solvent, and yet, from temporary causes, over which its officers have no control, suspend until these causes can be overcome. But they must be causes for which prudence and foresight cannot provide, or over which the bank or its officers had no control, or could have none. Such causes, when they do occur, are usually soon overcome. The bank again takes up its business, and proceeds with it in the usual way. The failure of the First National Bank of Kansas City, Missouri, on the twenty-ninth of January, 1878, would not have been a good cause for suspension, for that could have been, and, as we have seen, was, overcome by means, however, which may aid you in determining the solvency or insolvency of the Mastin Bank at the time of its failure. As much of what I shall say upon the phrase "in failing circumstances" applies also to solvency and insolvency of a bank, I pass to this branch of the case with the declaration that a bank is solvent, within the meaning of the constitution and statutes we are considering, when it possesses sufficient of assets to pay within a reasonable time all its liabilities through its own agencies, and is insolvent when, from the uncertainty of being able to realize on its assets, in a reasonable time, a sufficient amount to meet its liabilities, and therefore makes an assignment by which the control of its affairs and property passes out of its hands. The phrase "in failing circumstances," used in the constitution and statutes, when applied to a bank, must be taken to mean a state of uncertainty whether the bank will be able to sustain itself, depending on favorable or unfavorable contingencies, which in the course of business may occur, and over which its officers have no control. Thus, for instance, an individual may be said to be in failing circumstances when he is put to unusual shifts to meet his liabilities, such as borrowing money at unusual rates of interest, makes sacrifice, in the disposition of his property, which he would not do but for his con-

dition. Such a condition of things may exist regarding a bank, and, when this is the case, a bank, like an individual, may be said to be in failing condition. The funds of banks are supposed to be ready at hand to meet the wants of commercial, trading, and manufacturing communities in which they are located. Anything interfering with the availability of its funds, such as the carrying of large debts upon which nothing can be realized, except after long delays, investments in real estate which it may take time to turn into currrent funds,—any and all of these things, when they occur, may or may not tend to show whether a bank is in failing circumstances. Whether the matters here spoken of apply to the Mastin Bank you must determine from the evidence. In trying to arrive at a conclusion whether the Mastin Bank was insolvent or in failing circumstances on the twenty-sixth of June, 1878, you will bring before your mind the fact of the deposit by Mercer, treasurer, of $212,000 in 1876, when he went out of office; the evidence of a desire of Mastin, as testified, to get on Treasurer Gates' bond, with a hope, it may be, of either retaining the funds of the treasurer then on deposit, or to obtain additional funds, even. You will recall to memory the condition on which the aid was furnished by Gates under the influence of Burnes. It will not be improper for you to consider the business the Mastin Bank engaged in or stimulated outside of a regular banking business, so as to enable you to judge what influence, if any, it might have had on the solvency or insolvency of the bank. These matters, together with all others testified to in connection with the evidence given by Mastin and others in explanation of them, should all be carefully examined by you.

In considering what weight you will give to the testimony of any witness you will take into consideration the relation in which the witness stands to the bank, what interest he has in this suit, or suits of a similar character, pending against him on account of his connection with the bank; in fine, everything bearing on the witness, and calculated to affect or influence his testimony. Formerly the defendant was not permitted to testify in his own case, but of late years the law has allowed him to do so, leaving it to you to attach whatever of weight you see cause to attach to his testimony. You are the sole judges of the weight you will give to the matter testified to by any of the witnesses.

The duty you have to discharge is an important one. The people, by constitutional provisions, followed up by laws, have sought to protect the rights of the people in moneyed institutions. All this amounts to nothing unless the courts and jurors support the laws, and in proper cases enforce them. The duty may be a disagreeable one, but cannot be avoided without frittering away the spirit of the legislation upon the statutes. Do your duty under the fact and the law as given you by the court.