ELLIS, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 22—March 9, 1909.*

*Criminal law: Receiving deposits in insolvent bank: Statute con-
strued: Deposit of check as money: Indictment: Officer of bank
receiving deposit: What constitutes a deposit: Deposit by debtor
of bank: Insolvency: Evidence: Value of assets: Relevancy: Rep-
utation as to financial standing: Presumption as to continuance
of condition: How far retroactive: "Unsafe or insolvent."*

1. If a person deposits in a bank for his credit a check, and it is
   presently treated between such person and such bank as money,
   the former obtaining credit upon which he may, at his pleasure,
   draw for money, sec. 4541, Stats. (1898), is satisfied, as regards
   a deposit of money.
2. A charge in an indictment or information under such section,
   that a particular person deposited in a specified bank, for his
   credit, a check on another bank and that it was received for
   the bank by its president, naming him, and accepted on deposit,
   satisfies all the essentials of such section as to an officer of
   a bank, in his capacity as such officer, accepting or receiving
   money on deposit.
3. In case of an officer of a bank accepting for such bank money
   of another to be, and which is, deposited for his credit to be
   at his pleasure drawn on, the status of such officer as regards
   sec. 4541, Stats. (1898), is thereby fixed regardless of whether
   the depositor owes the bank on paper, due to and which does

mature shortly so as to absorb the deposit, in part, before the bank is forced to suspend.

4. In case of a person depositing money in a bank as against an existing overdraft, so far as it goes in discharge of such indebtedness, it is not a deposit within the meaning of sec. 4541, Stats. (1898).

5. The call of the statute, as regards the act constituting a criminal fraud, is a deposit such as will create a credit; the relation of debtor and creditor between the parties, or that of bailor and bailee or that of principal and agent.

6. Evidence of the reputation of a person as regards financial standing is relevant.

7. Evidence of the value of commercial paper based wholly on ignorance of the witness as to whether the maker possesses any property liable to execution, is not relevant, on the subject of the solvency of the maker.

8. "When the existence of a person, a personal relation, or state of things is once established by proof, the law presumes that the person, personal relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised from the nature of the subject in question."

9. No presumption is raised in the manner aforesaid which is materially retroactive.

10. Proof of insolvency at a particular time does not create a presumption that the same condition existed at any considerable time anterior thereto, nor is it evidentiary of such condition at a time very remote from that to which the evidence is directed.

11. Proof that a person was insolvent at a particular time by means of judgments against him shown at such time to be uncollectible, as circumstantial evidence that he was insolvent six months or more prior thereto, especially in case of his having shortly after the earlier date transferred his property for the purpose of securing payment of his obligations, is not relevant.

12. Within reasonable limits under reasonable circumstances proof of insolvency of a person at a particular date as circumstantially bearing on like insolvency at an earlier date, is relevant.

13. Whether evidence of the nature mentioned in the last foregoing is relevant or not, raises, primarily, a question of competency, in which field the decision of the trial court should not be disturbed on appeal unless clearly wrong.

14. In the situation suggested in the last foregoing, if the prior date under all the circumstances is too remote to permit of the circumstance of insolvency at the later date having reasonably any evidentiary significance, it is irrelevant.

15. In case officers of a bank are largely indebted thereto and pos-
sess property interests in a corporation to a very significant
amount as compared to such indebtedness, and they convey such
property to the bank on account of such indebtedness, pursu-
ant to an understanding of long standing, the situation before
the conveyance should be regarded substantially the same as
that thereafter, as regards the mental state of such officers re-
specting the condition of the bank as to solvency.

16. In the situation in the last foregoing the fact that some of the
officers, equally interested in the bank and the outside prop-
erty mentioned, are not debtors of the bank but have, neverthe-
less, agreed with their associates to join in conveying such
property to strengthen it as to paper on which they were not
liable, creating a moral obligation, only, to so join, which obliga-
tion the other officers have good reason to suppose will be, and
in fact is, redeemed, does not militate against the outside in-
terest of such nondebtor officers being considered by the others,
before the transfer, on the question of whether the bank is
solvent.

17. The words "unsafe or insolvent" in sec. 4541, Stats. (1898), are
used therein as legal equivalents.

18. The term "unsafe or insolvent" as used in sec. 4541, Stats. (1898),
does not mean insolvent in the limited sense of inability to pay
indebtedness in the ordinary course of business.

19. The term mentioned means insolvent in the broad general sense
of a deficiency of one's assets in realizable cash available within
a reasonable time, treated as an ordinarily prudent person
would generally conduct his business under the same or similar
circumstances, to pay his liabilities.

20. A bank is unsafe or insolvent within the meaning of the statute
when the cash value of its assets, realizable in a reasonable
time, in case of liquidation by its proprietors as ordinarily
prudent persons would ordinarily close up their business, is not
equal to its liabilities, exclusive of stock liabilities.

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the circuit court for Eau
Claire county: JAMES O'NEILL, Circuit Judge. *Reversed.*

Writ of error to review a conviction for the offense of re-
ceiving money into a bank for the credit of a depositor with
knowledge, or good reason to know, that the bank was unsafe
or insolvent, contrary to sec. 4541, Stats. (1898).

The accused, during the time stated in the indictment, was
president of the Security Savings Bank, a duly organized

banking corporation under the laws of this state, located at Ashland, Wisconsin.

The indictment contained three counts, each for a violation of sec. 4541, aforesaid. The first was for receiving into the bank January 29, 1904, of A. L. Goodman, $125 in lawful money for his credit. The second was for so receiving February 2, 1904, a check for $1,000 of that value for credit of A. Donald. The third was for so receiving February 8, 1904, money and bank checks of the value of $59.65 from W. T. Briggs for his credit.

As to each alleged violation of law it was charged the accused received the deposit as president of the bank, knowing, or having good reason to know, that the bank was unsafe and insolvent.

The case was duly tried on a plea of not guilty. Questions discussed in the opinion were in due form saved for review.

The bank was duly incorporated September 10, 1903, as successor to a banking business previously conducted by a partnership composed of the accused, his brother, E. H. Ellis, and his sisters, Danielia Loranger and Augusta Kennedy. Prior to such date the capital was $20,000 and business was dominated by the accused, he being supposed by the public to be substantially the sole owner. In the new organization the four persons named took the stock in equal proportions, except one share taken by Ellis Kennedy, son of Augusta Kennedy.

The stock was fixed at $50,000. The corporation started business with a duly approved paid-up capital of that amount. All assets of the private bank were turned over to the new organization and it assumed the liabilities. From the time of the new organization to the time it closed February 13, 1904, by reason of general disturbed financial conditions, some special local disturbances, and other causes, patrons of the bank withdrew credits to the extent of about one third, the

deposits being reduced from $162,560.97 to $107,000 or thereabouts. Prior to the day named the proprietors partially arranged to borrow on assets of the bank $35,000, thinking that amount would tide over the difficulties, but before concluding to secure the money a consultation was had with the bank examiner, who, after an examination of the affairs of the bank, approved of its continuing, if, in the judgment of the proprietors, the $35,000 would so strengthen the reserves as to provide against a continuation of the reduction of deposits. Not feeling certain in that respect, the proprietors concluded to go into liquidation and the bank was closed accordingly, control of it being turned over to the bank examiner. At such time the amount of assets was $231,006.05 and liabilities other than to stockholders $108,270.46. The assets of the bank on February 3, 1904, and for a considerable period prior thereto, consisted of commercial paper around $75,000 in amount, which depended, for its value, in the main, upon responsibility of the accused, E. H. Ellis, and Ellis S. Kennedy, real-estate mortgage security as to Kennedy's indebtedness, and a moral obligation hereafter explained as to some indebtedness of George C. Loranger. Of this paper $6,300 was the obligation of George C. Loranger, on which the accused was liable as an indorser, $1,100 was paper of one Holbrook, son-in-law of the latter, and $12,500 of E. S. Kennedy, son of Augusta Kennedy. On such day the stockholders of the bank were proprietors of the stock of the Bay City Land Company in the same proportion as they were of the stock of the bank. Danielia Loranger, one of such stockholders, had verbally promised to convey her interest in the land company to the bank to care for the indebtedness of her husband to the bank and the indebtedness of Holbrook, and all the stockholders of such company understood from the time of the organization of the bank that the company's property should be devoted to the interests of the bank. The value of the obligations of Mr. Loranger, the Ellises, and E. S. Kennedy on such

day depended, in the main, except as to the real-estate security mentioned, upon the responsibility of the stockholders in the land company and the moral obligations of Mrs. Loranger and Mrs. Kennedy to devote their interests in such company to those of the bank. Pursuant to such obligation the land company's assets, consisting of real estate of the assessed valuation of about $72,000, were conveyed to the bank. It had all such property at the later date when the bank was taken possession of by the bank examiner.

The evidence established all the matters aforesaid without dispute and further so established that the business of the bank was conducted without any refusal to pay any legitimate demand upon it up to the time it closed as aforesaid without supposing liquidation would be necessary, up to the time of the conference with the bank examiner aforesaid. There was further undisputed evidence that the value of the assets of the bank on the day of the closing and on and after February 3 and 4, 1904, was somewhere around $160,000, as the same was reasonably viewed at the time, and that such value existed on the 29th day of January, 1904, and thereafter up to and inclusive of February 2, 1904, contingent upon the responsibility of the stockholders of the land company being such, by reason of their ownership of the stock of such company, as to render their obligations to the bank substantially as good before the assets of the land company were turned over to the bank as thereafter. The evidence was further undisputed that, viewing the assets of the bank during the period from January 29, 1904, to and inclusive of February 13, 1904, exclusive of the land company's property and the obligations on account of which the same was turned over to the bank, they were of the value of at least about $188,000, or enough to cover the liabilities into about $20,000, and that, taking the property of the land company at the value placed thereon by the witnesses, or taking the value of the paper, on account of which such property was turned over to the bank, at substan-

tially equal to the value of such property as so placed, there was a surplus of assets over liabilities, at each of the times material under the information, of somewhere around $50,000.

There was no evidence indicating that, on either of such dates, the proprietors of the bank contemplated going into liquidation, or had any thought other than that the bank would remain indefinitely in business. There was evidence that at the time the bank was examined by the bank examiner, just previous to his taking possession, he was of the opinion there were assets sufficient to pay the liabilities, especially, except stock liabilities, and that he was of the opinion, when the bank closed, the proprietors did not believe but that there were assets sufficent to pay out, in money, all liabilities to depositors.

There was evidence to the effect that, when the deposit was made, mentioned in the first count of the indictment, the same was placed to the credit of the depositor, who at that time owed the bank a considerable amount, but that none of it was then due. The evidence as to the deposit mentioned in the second count was to the effect that it was treated as cash, the amount the check called for being placed to the depositor's credit, and that the check was afterwards paid to the bank.

There was evidence to the effect that for a considerable time before the occurrence mentioned in the indictment, and up to the time the bank closed, the law was not complied with as to reserves; also evidence that some overdrafts were allowed, there being such at the time of the suspension to the amount of about $4,000, about $900 of which was against responsible persons other than the proprietors of the bank, and $1,700 only good, so far as the responsibility of the proprietors of the bank would make it so, either as owners of the property of the land company or as having turned such property over to the bank, leaving about $1,600 of overdrafts of no value.

There was other evidence as to want of good judgment in

the conduct of the bank, and evidence that after the proprie-tors had turned all their money over thereto, as they did, nothing could be collected of them.

The cause was submitted to the jury, resulting in a verdict of guilty on the first and second counts and not guilty on the third. The various exceptions saved upon the trial will be mentioned in their order of importance in the opinion.

For the plaintiff in error there was a brief by *Sanborn, Lamoreux & Pray,* and oral argument by *A. W. Sanborn* and *B. W. Jones.*

For the defendant in error there was a brief by the *Attorney General, V. T. Pierrelee,* district attorney for Ashland county, and *M. Barry,* assistant to district attorney for Ashland county, and oral argument by *Mr. Pierrelee* and *Mr. Barry.*

MARSHALL, J. In the foregoing statement we have avoided going into details or dealing much with figures, except in the way of generalizations. There is such a r‑ass of things in the record that any attempt to state it in detail would fail of accomplishing any valuable purpose and probably would leave the situation more or less involved in confusion.

The legal questions are few in number and will be presented in their logical order.

The fact that the deposit relied upon in the second count in the indictment was a check does not militate against its satisfying the call of sec. 4541, Stats. (1898), for a deposit of money. True, the check, as it went over the counter, was not money, but it was treated as such between the bank and its customer. It was taken as the equivalent of money at the face value. The money equivalent was placed to the credit of the depositor the same, in all respects, as if legal tender money had been passed over the counter. The relation of debtor and creditor, as between the bank and the depositor, with the characterization of liability on the one side and expectancy on

the other as to payment on demand at any time during banking hours, was created. In short, the transaction, in practical effect, was the same as if the bank had passed to its customer $1,000 for the check and he had immediately passed the same back for deposit and received credit therefor.

The foregoing, in the opinion of the court, is in harmony with—and really required by the rule of *stare decisis* on account of—*State v. Shove,* 96 Wis. 1, 70 N. W. 312. We cannot appreciate that there is any difference between passing a certificate of deposit on a bank over its counter for credit or a renewal, the presumption being that money equivalent for such certificate is on hand to be passed out in exchange for the paper if desired, and passing over the counter a certificate of deposit or check or bill of exchange on another bank, which is taken as so much money in the ordinary course of business, the money itself being, presumably, present to be transmitted, if desired, in exchange for the paper. To say there is a difference in the two situations would, in our opinion, be trifling with the statute.

It is confessed that the indictment, in substance and practical effect, is the same as in *State v. Shove, supra,* but insisted that, as no point was made on the sufficiency of the charge in such case, the way is clear for a challenge in that regard now. Granted, for the purpose of the discussion. The following defects are now suggested: (a) It does not appear from the charge that the bank became the debtor of the depositor named in the first count. (b) It does not appear that the deposit consisted of money. (c) It does not appear that *Ellis* received the deposit for the bank.

The requisite of the statute as to (a) and (b), so far as is necessary to this case, is acceptance or reception on deposit of money tendered for that purpose by a customer. That is plainly charged in the first count in the language of the statute, and is likewise so charged in the second, in the light of what we have said as to the reception of the check as money,

being the same as if the thing passed over the counter had been money, in fact.

(c) The claim that the indictment does not show that the accused acted, in receiving the deposits, for the bank, seems to be without merit. After charging receipt of money on deposit, in the one case, and the check in the other, the language of the indictment, as to each, is, substantially, that the accused was, at the time of receiving the deposit, the president of the bank and the money was accepted and received into the bank on deposit. What more is needed? We cannot discover anything wanting.

The fact that the customer mentioned in the first count was indebted to the bank at the time he made his deposit, especially, since the indebtedness was not presently due, does not militate against the receipt of the money satisfying the statute as to that element. The credit created by the deposit was at the customer's disposal immediately upon its creation. The status of the accused was fixed, as regards guilt under the statute, the instant the deposit was accepted as creating a credit, liable to be called for at once, and was not subject to change by maturity of the depositor's indebtedness thereafter, before the bank closed, so as to absorb a part or the whole of it. Had the deposit been made on account of the indebtedness about to mature, and to be applied thereon, or made on account of an overdraft, so as to operate to discharge the depositor's indebtedness to the bank, the case would be far different. True, it would be absurd to hold that a deposit, in form, which, in practical effect, is only payment of an indebtedness on an overdrawn account, would satisfy the statutory call for a deposit of money or other thing used as money and subject to be recalled in money. Such call contemplates a deposit such as will create the relation of debtor and creditor between the parties, or bailor and bailee, or the relation of principal and agent, the former only being material to this case.

A witness who, upon the *voir dire,* was supposed to have

shown special knowledge of the character of commercial paper made by parties in the city of Ashland and its vicinity, was permitted to give his opinion, generally, of the value of specific pieces of paper mentioned to him, about the time of the occurrences, material to the case. He was not asked as to whether he knew the reputation of the maker or indorser of the paper as to solvency, but as to the value of the paper as a commodity in the community, from the standpoint of whether the parties named, to the knowledge of the witness, had any property out of which the same could be collected. He stated, definitely, that his testimony was based, not on knowledge of whether the parties possessed property or not, but on ignorance of whether they had any. The motion made to strike out such testimony should have been granted. True, if the witness had shown, with any degree of fairness, on the *voir dire,* that he knew the reputation of the makers of the paper for solvency, he might have been permitted to testify to such reputation. True, evidence of the general reputation of a person for financial responsibility is relevant on the question of his solvency. That does not seem to have been directly passed upon by this court, but it has by many, and may be said to be entirely settled, though not by universal authority. We will not go into the subject at length but state, with approval, that the rule is as indicated. The following are a sample of a multitude of judicial authorities on the subject: *Hahn v. Penney,* 60 Minn. 487, 490, 62 N. W. 1129; *West v. St. Paul Nat. Bank,* 54 Minn. 466, 56 N. W. 54; *Angell v. Rosenbury,* 12 Mich. 241; *Bank of Middlebury v. Rutland,* 33 Vt. 414.

The evidence discussed was not of the character of opinion evidence as to reputableness for solvency. True, on cross-examination there was some evidence from the witness that he testified, from reputation, as to the financial standing of one maker of a note brought to his attention, but, in general, his evidence was confined to opinions on the basis before indi-

cated. He gave no evidence that he, in fact, knew whether the debtor had property or not. On the whole, it seems that the evidence was not relevant. It did not approach near enough to the real point at issue to have sufficient probative force to be within the realms of competency. Therefore, in the opinion of the court, it should have been stricken out as indicated.

Complaint is made because the court permitted much evidence as regards financial condition of debtors of the bank, particularly the proprietors, long after the suspension, without direct proof that the same condition existed at the time of the occurrences charged in the indictment. A judgment against the accused for $32,526.33 in favor of the receiver of the bank, rendered some six months after the suspension, covering substantially all the liabilities of the accused to the bank, was received. Similar proof was made as to other debts to the bank in connection with evidence of unsuccessful efforts to collect on the judgments. Much of this evidence, so far as direct effect was concerned, related to the condition of things from six months to some over a year after the deposits were alleged to have been wrongfully received.

It is an elementary principle of evidence that, as a general rule, presumptions do not run backward; that while "when the existence of a person, a personal relation, or state of things is once established by proof, the law presumes that the person, personal relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised from the nature of the subject in question" (*State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 107 N. W. 500; 1 Greenl. Ev. § 41),—there is no retroactive evidentiary inference, especially reaching backward, materially. So, proof of insanity or insolvency at a particular time, is not competent to prove, on the principle of natural and probable relation, the same condition a considerable period prior thereto. But the question of whether a circumstance is of sufficient probative force to have the dignity of a

legal presumption of fact, establishing the matter in controversy, *prima facie,* as in case of the rule stated, is one thing, and that of whether it is so utterly void of probative power as to be outside the realms of competency and so irrelevant, is quite another.

It must be conceded that, while evidence of the character of that in question might not establish a condition which would raise a legal presumption running backward, if the condition were not too remote it would not be entirely without evidentiary consequence. Such consequence might be considerable under some circumstances. For instance, in case of proof of entire want of assets to meet liabilities a few days after the particular time vital to a controversy. It would, necessarily, diminish in weight, according to remoteness, and eventually become so shadowy as to pass into the realms of conjecture, and so outside the field of competency, thereby becoming wholly irrelevant. Within a considerable field, the primary question, as to admissibility, would be one of competency, in which field, as in all others where the trial court is required to determine matters of fact, there is a broad range for the exercise of judgment, in which the trial court is quite supreme, so much so, that its rulings should not be disturbed unless clearly wrong. *Emery v. State,* 101 Wis. 627, 648, 78 N. W. 145; *Johnson v. State,* 129 Wis. 146, 152, 108 N. W. 55.

It is the opinion of the court that considerable of the evidence objected to was improperly received under the principles suggested; particularly, judgments against persons who, before the suspension, divested themselves of all of their property, by turning it over to the bank on account of the very indebtedness represented by the judgments subsequently rendered, and, further, in view of the failure of counsel to make good the pledge given to the court at the time the evidence was received, that evidence would be offered that there had not been any substantial change in the financial condition of

the persons, to whose status the remote evidence related, from the time of the occurrences charged in the indictment down to the time of the remote condition proved, or attempted to be proved. These general observations are all that seems necessary on this branch of the case.

The trial court gave instructions excepted to, and refused to give instructions requested, upon the theory that, the value of the property of the land company turned over to the bank, on account of liabilities of the stockholders, in the main, February 3, 1904, could not be considered on the question of whether the bank was unsafe or insolvent to the knowledge, or with good reason for knowledge, on the part of the accused, at any time prior to such date, but could be from and thereafter. That, it seems, was manifestly wrong, and a wrong which, quite likely, was fatal to the accused, as to the first and second counts, inasmuch as, while the accused was acquitted as to the circumstance that happened a few days after the land company's property was turned over to the bank, he was convicted as to that which happened the day before and the one which happened five days before.

It seems that, aside from the interest which Mrs. Loranger and Mrs. Kennedy had in the land company, such company's property, from a legal standpoint, was behind the liability of the debtor stockholders of the bank, substantially the same on the 29th day of January, 1904, as on the subsequent dates material to the case. Since there was an understanding prior to the 29th, to which Mrs. Loranger and Mrs. Kennedy were parties, that all the land company's property should be turned over to the bank on account of the liabilities of the stockholders thereto to strengthen its resources, and particularly as the accused had, as it seems, sufficient influence with his associates to secure their co-operation as to anything he desired done to strengthen the bank,—he had substantially the same reason on January 29 to consider the value of the land company property with reference to the

solvency of the bank, as at any later time. In the light of the result of the trial as to the third count in the indictment, it seems reasonably certain that had the case been presented to the jury in this way, there would have been a verdict of not guilty on all the charges. There can hardly be any mistake about that in view of the undisputed evidence that, considering the land company property, the cash value of the bank assets, at the times in question, as the accused had a right to view them, exceeded the liabilities to depositors by about forty per cent.

On the question of whether there was the excess stated, we have little or no doubt. We have checked over carefully the claim in that regard by counsel for the accused, and find it substantially correct. There is no substantial claim to the contrary in the brief of counsel for defendant in error. On the oral argument counsel were pointedly challenged in respect thereto several times from the bench, and, while they did not concede there was such excess, their attitude was such as to suggest, very strongly, that they were not prepared to more than deny that there were assets of a convertible character sufficient to enable the bank to meet its liabilities in the ordinary course of business, or enough to pay anywhere near all the debts, as it turned out.

The latter condition mentioned is not very persuasive as to the condition of mind of the accused, or the knowledge he should have had on the 29th day of January, 1904. It is a matter of common knowledge that assets in the hands of a going banking concern are regarded very differently from the same assets, upon the bank going into forced liquidation. The change of circumstances is quite likely to depreciate the value of the securities to a very marked degree.

The learned trial court charged the jury, over and over again, that whether the bank was insolvent on the particular days material to the case, turned on whether it had sufficient assets to meet its liabilities in the ordinary course of business,

and whether the accused at such time had good reason to know the bank was unsafe or insolvent, was whether he had such reason to know it did not possess sufficient assets to pay all its. liabilities as they matured and became payable in the ordinary course of business. On the other hand the learned court. refused to instruct the jury that the statutory test was. whether the fair value of the assets on the particular days. named was sufficient to cover the liabilities, exclusive of liabilities to stockholders.

In view of the situation that, according to the undisputed proof, there was an excess of assets over liabilities, within the rule requested to be given to the jury, the error in refusing such request, if there were error in that regard, was prejudicial in the highest degree, since such request, in view of the evidence, was, in effect, one to render a verdict in favor of the accused.

There is no question but that insolvency, as the subject is dealt with under the insolvent and bankrupt laws, regarding a condition where, by the theory of such laws, the person or concern should suspend and take such measures or submit to such, for the protection of creditors, as to insure equality of treatment, is as the court instructed the jury. That is the limited, not the common, popular, or general meaning of the term. The latter suggests, merely, a substantial deficiency of assets to cover liabilities. In a multitude of authorities involving administration of bankrupt and insolvent laws and situations properly classible therewith, authorities mainly relied upon by the prosecution, insolvency is viewed in the limited sense, while the general sense is universally conceded to be as indicated. So it will be seen that a bank may be insolvent in the limited sense and clearly not in the broad general sense.

Must the limited meaning be given to the term "unsafe or insolvent" as used in the statute? Is it true that, under all circumstances, the proprietors of a bank, though believing

Ellis v. State, 138 Wis. 513..

they have an abundance of assets to pay out within a reasonable time all liabilities to depositors, must close the doors and go into liquidation whenever they have good reason to know they will, or probably may, not be able to pay all demands upon the bank in the usual course of business, and that every moment of time they keep open for business thereafter they are criminals before the law and liable to be prosecuted and punished by long terms of confinement in the state prison? If such is the law, the banking business is exceedingly unattractive and the more conscientious the banker is, the less attractive it is.

It must be seen, at once, that the statute is open to construction. The words used have the two well known and widely different meanings. By the familiar rule that, in general, the common, ordinary meaning of words in a law is to be taken as the one intended by the legislature, we must discover some efficient reason for holding that it did not have in mind, in enacting the law in question, the one which the learned trial court rejected.

While it is reasoned by some courts that the mischiefs to be guarded against by such legislation suggest the limited meaning as intended, such reasoning is not satisfactory and is not in accord with the reasoning of other just as respectable courts holding to the contrary view.

There is no more legitimate business than that of banking. There are laws for the promotion of it, beneficial to those engaged therein and their patrons, in every civilized nation on earth. Our laws contemplate that all but a small proportion of the deposits in a state bank and all of its capital stock may be loaned for considerable periods of time and quite a proportion on real-estate security. It is permitted to put twenty-five per cent. of its capital and surplus into banking house and fixtures. It is permitted to loan fifty per cent. of capital, surplus and deposits upon real-estate security, and without limit in this and adjoining states when authorized by a resolution

of two thirds of the board of directors. There is a legal limit upon the amount that may be loaned directly to one person, but there is no limit whatever as to indirect loans, and no limit as to loaning on approved security to a single borrower, short of the whole capital stock and surplus, in case of two thirds of the directors consenting thereto by a duly recorded vote. There is no limit as to time upon which loans may be made. Notwithstanding this broad discretion the law only requires a reserve on hand in cash, either in bank or available in correspondent reserve banks, of fifteen per cent. of the deposits.

In the situation indicated, would it be reasonable to suppose that a bank must, at all events, be prepared to pay every one who calls his credit in the usual course of business under peril of the severe punishment provided in sec. 4541, Stats. (1898) ? Must persons engaged in such business, while not going outside the permitted methods with bad intent, upon every occasion of their competency to pay in the usual course of business being challenged, regardless of competency to pay ultimately, be conscious of drifting within the shades of prison walls; into realms of everlasting disgrace for themselves and their families? The very picture, not at all overdrawn it is thought, suggests, most forcibly, that such a meaning as the learned trial court attributed to the statute would lead to the most absurd results. That of itself would require rejection of such meaning, there being another perfectly reasonable, and a fairly, at least, appropriate one.

The reason for not adopting the drastic meaning attributed to the statute by the trial judge, suggested from the viewpoint of the banker, is reinforced by one quite as persuasive from the point of view of patrons of a bank. It is a matter of common knowledge that liquidation of a bank in insolvency proceedings is inevitably attended with great losses which commonly fall on the depositors. So when a banker stands face to face with a condition of probable inability, merely to pay

all liabilities "in the ordinary course of business," he knows that to go into liquidation, unless that is absolutely necessary, is inviting disaster for the depositor often in far greater measure than to persist in going on. Premature suspension or unnecessary suspension often is the very worst thing that could happen to the persons the statute is designed to protect. In that situation, if the statute were construed as the counsel for defendant in error contend it should be, the fabled position of most unfortunate danger would be quite real, the banker while bending all his energies to perform his duty of avoiding danger on the one side would be quite likely to fall into a still greater danger on the other. Avoiding Scylla, he would fall into Charybdis.

Looking to our own decisions we find that the precise question under discussion has not been heretofore treated. Our attention is called to *Baker v. State,* 54 Wis. 368, 12 N. W. 12; *In re Koetting,* 90 Wis. 166, 62 N. W. 622; *State v. Shove,* 96 Wis. 1, 70 N. W. 312, but in neither is the question discussed or helpfully alluded to, much less decided. The same condition exists in most all the adjudications elsewhere under similar statutes. The secret of that, doubtless, is that only in rare instances has there been a prosecution of this sort unless the bank was so hopelessly insolvent that its condition in that regard satisfied every meaning of the term insolvency, beyond question.

In *State v. Cadwell,* 79 Iowa, 432, 44 N. W. 700, the bankruptcy rule was adopted, citing in support thereof wholly civil cases where such rule is appropriate. The reasoning in the opinion does not appeal favorably to our understanding. It is wholly from a one-sided point of view. The bank there was insolvent under any rule and unquestionably so. Reference is made to a federal case, without stating where it may be found, but it is sufficiently identified to point, unmistakably, to *Dodge v. Mastin,* 17 Fed. 660. Turning thereto we find it held that a bank may be insolvent in the limited sense

the term is used in bankruptcy matters; it may even be forced to close its doors for want of money to pay all calls upon it in the ordinary course of business,—and yet not be insolvent within the meaning of the criminal law.   It was said:

"A bank is solvent, within the meaning of the constitution and the statutes we are considering, when it possesses sufficient of assets to pay within a reasonable time all its liabilities through its own agencies."

The Iowa case has been cited with a measure of approval in some instances, but not in any one of consequence of this sort, so far as we are able to discover.   It must be conceded it has some support in *State v. Beach,* 147 Ind. 74, 43 N. E. 949, 46 N. E. 145; *Queenan v. Palmer,* 117 Ill. 619, 7 N. E. 470, 613; *Meadowcroft v. People,* 163 Ill. 56, 45 N. E. 303; *State v. Myers,* 54 Kan. 206, 38 Pac. 296.   In a pretty full review of authorities in an article in 37 Cent. Law J. 147, it is condemned, authorities being cited and logic used to the conclusion that a bank is not unsafe or insolvent, in the language of the criminal law, if its property is worth more than all its liabilities, even though it be in such condition, at the time of receiving a deposit, that it has to default soon on maturing liabilities.   We should remark, in passing, that the author took note of the fact that in the Iowa case the bank was hopelessly insolvent within any meaning of the term, so the court did not need to go to the extent it did.   For that reason, we may well apprehend, the question did not receive the attention, at the hands of the court, it otherwise would.

We will close this opinion without any extensive review of authorities.   We venture to say that, in all situations except in respect to the administration of bankruptcy and insolvency laws, the term under consideration is regarded as contemplating insufficiency of assets, in money value, to balance liabilities, such money value to be realized, not by a forced and in-

voluntary sale, but by handling in the ordinary way an ordinarily prudent man would generally conduct his business under the same or similar circumstances.

The following are examples of the application of the rule we have stated: *Hamilton v. Menominee Falls Q. Co.* 106 Wis. 352, 81 N. W. 876; *Marvin v. Anderson,* 111 Wis. 387, 87 N. W. 226; *Shaw v. Gilbert,* 111 Wis. 165, 86 N. W. 188; *Livingston v. Bank of New York,* 26 Barb. 304, 308; *Walkenshaw v. Perzel,* 32 How. Pr. 233. The position of this court on the general question is well summarized in the syllabus to *Hamilton v. Menominee Falls Q. Co., supra,* thus:

"Insolvency, in such connection, does not mean an insufficiency of quick assets to pay all debts at once, nor inability to meet commercial obligations as they fall due in the course of business, but that the property of the corporation, real and personal, estimated at a fair and reasonable valuation, is substantially less than its debts."

There is a peculiarity in our statute, perhaps distinguishing it from the Iowa statute and certainly from those of Indiana, Kansas, Illinois, and many other states. The word "insolvent" only is used in most statutes, while that, in connection with the word "unsafe," is used in ours. Not in the disjunctive, as said in *In re Koetting,* 90 Wis. 166, 62 N. W. 622, to suggest separate conditions forming bases for the criminal liability, but as "legal equivalents," the latter word to explain and emphasize the first. That fairly indicates that the legislative idea was something more than insolvency in the limited sense.

An examination of the statutes of other states fails to disclose any similar use of words in a similar statute, except in Minnesota. Ch. 219, Laws of Minn. 1895. The supreme court of that state in *State v. Clements,* 82 Minn. 434, 85 N. W. 229, in defining the term, rejected the idea of competency to pay liabilities "in the ordinary course of business," adopt-

ing this, by way of approval of the trial court's instruction
on the subject:

"If the assets of a banking firm and of the individual mem-
bers thereof are insufficient in value to pay the debts of such
firm, then such firm is insolvent. A bank or banking firm is
solvent, within the meaning of the statute, when it and its
several members possess assets of sufficient value to pay,.
within a reasonable time, all its liabilities through its own
agencies, and is insolvent when it and its individual members
do not possess assets of such value."

We approve of that, substantially, preferring, however, to
express it in this way: The term "unsafe or insolvent" in
sec. 4541, Stats. (1898), has regard to deficiency of assets,
realizable in cash value within a reasonable time, treating
them as an ordinarily prudent person would ordinarily con-
duct his business, to cover liabilities exclusive of stock liabili-
ties. A bank is insolvent when the fair cash value of its as-
sets, realizable within a reasonable time, in case of liquida-
tion by the proprietors, as ordinarily prudent persons would
ordinarily close up their business, is equivalent to its liabili-
ties, exclusive of stock liability.

That gives a sensible construction to the statute, treating
the banking business with the consideration it deserves both
from the standpoint of patrons and patronized, instead of
treating those engaged therein, and responsible for the safety
of the cash and idle capital of the country, and responsible for
the correctness of the innumerable exchange transactions of
business in every-day life, as if they were a dangerous class,
to be fenced about as classes generally are, of criminal tend-
encies. It provides punishment for the really bad and with-
out crushing the merely unfortunate, and subjecting all, or a
large proportion, in perilous financial periods, to worriment
of unreasonable menace.

A point made that the law under which the grand jury was
drawn which found the indictment is unconstitutional, be-

cause it denies to an accused person the equal protection of the laws and due process of law, is ruled in favor of the defendant in error by *State ex rel. Gubbins v. Anson,* 132 Wis. 461, 112 N. W. 475; *Vought v. State,* 135 Wis. 6, 114 N. W. 518, 646.

There is no other question which needs discussion or even mention. The judgment must be reversed. Whether the cause should be remanded with directions to discharge the accused upon the ground that he should have been discharged on the case and motion made therefor below, is not free from difficulty. That such course would be the right administration, in a clear case of uselessness of a new trial, within the contemplation of the Code which on reversal requires the cause to be remanded for a new trial, only when necessary; that is, only when justice, in the judgment of this court, does, or seemingly may, demand it (sec. 3071, Stats. 1898), has been vindicated,—many times in recent years. *Muench v. Heinemann,* 119 Wis. 441, 96 N. W. 800; *Hay v. Baraboo,* 127 Wis. 1, 105 N. W. 654; *Miller v. State,* 139 Wis. 57, 119 N. W. 850.

When it is clear that a full trial has been had and that a new trial would not be liable to change the situation, assuming that the witnesses who testified cannot honestly do more than repeat their testimony, public and private interests as well demand that, upon a reversal here, such disposition should be made of the matter as to terminate the litigation.

Because of the probability, amounting to almost reasonable certainty, in view of the verdict on the third charge, that under proper instructions there would have been a full acquittal, and other circumstances in the case—a demand for a new trial, from the standpoint of public justice, is not very clear. However, since the case was tried on quite an untenable theory, it is the opinion of the court that it should be remanded for a new trial, which will not preclude the prosecuting at-

torney, if he shall deem best, from dismissing the cause with consent of the trial court.

*By the Court.*—The judgment is reversed, and the cause remanded for a new trial.

Barnes, J., took no part.