CASE 11.—PROSECUTION AGAINST JAMES H. PARRISH
FOR RECEIVING A DEPOSIT WHILE. PRESIDENT
OF THE BANK, KNOWING THAT THE BANK WAS
INSOLVENT.—December 9, 1909.

## Parrish v. Commonwealth

. 136   77
f136  361
136  795

136   77
138  577

Appeal from Hancock Circuit Court.

T. F. BIRKHEAD, Circuit Judge.

Defendant convicted and appeals.—Affirmed.

1. Banks and Banking—Officers—Offenses—Insolvency—Receiv-
ing Deposits—Indictment—"Deposit."—An indictment of the
president of a bank for receiving a deposit knowing the
bank to be insolvent, which alleged the receipt of a deposit
of the value of $130, was sufficient to show that the deposit
was in money, checks, or drafts, aggregating the amount spec-
ified; the word "deposit" being used in its popular sense
to imply that the depositor had placed in the bank money,
or evidences or representatives of money such as banks of
deposit are authorized to, and do, receive; so that the in-
dictment was not defective for failure to accurately describe
the items.
2. -Indictment and Information—Bill of Particulars.—Where an
indictment against a bank president for receiving a deposit
with knowledge of the bank's insolvency alleged that the
deposit was of the value of $130, a bill of particulars speci-
fying the items was not required.
3. Banks and Banking—Officers—Offenses—Receiving Deposits
Illegally.—In an indictment of a bank president for receiving
a deposit knowing that the bank was insolvent, it was not
necessary to allege the name or style of the office in the bank
held by the person who received the deposit.
4. Banks and Banking—Receiving Deposits Illegally.—In a pros-
ecution of a bank president for receiving a deposit with
knowledge of the bank's insolvency, the person who actually
received the deposit, the position he held in the bank, or the
name of the individual who made the deposit in person
was not material.

Parrish v. Commonwealth.

5. Indictment and Information—Allegation of Insolvency.—An allegation that the bank of which accused was president was insolvent when he received the deposit in question was an allegation of fact and was not objectionable as a conclusion.

6. Banks and Banking—Officers—Offenses—Receiving Deposits Illegally.—In a prosecution of a bank president for receiving a deposit knowing that the bank was insolvent, in violation of Ky. St. Sec. 597 (Russell's St. Sec. 2186), the state must prove that the deposit described in the indictment was actually received; that at the time it was received the bank was insolvent; that accused had knowledge of its insolvency, and, with such knowledge, assented to receiving the deposits.

7. Banks and Banking—Offenses—Receiving Deposits Illegally—Evidence—Notice.—In a prosecution of a bank president for receiving deposits with knowledge of the bank's insolvency, an affidavit, made by the cashier of the bank on the day following the receipt of the deposit, stating that the bank was insolvent; letters written to accused by persons interested in the bank suggesting that it was not being prudently managed, the fact that depositors who attempted to withdraw their deposits were not allowed to do so; evidence of excessive loans made to accused· to other members of his family, and to further activities in which he was interested; the fact that the bank paid a high rate of interest on deposits; the value and character of insolvent and worthless paper carried by the bank, and the amount ultimately realized from the disposal of all the bank's assets administered in a prudent and businesslike way; fraudulent methods resorted to by accused in making reports to the Secretary of State; failure to keep on hand the reserve required by the statute; loans to individuals in excess of the amount permitted by law—were admissible to prove that accused had notice that the bank was insolvent when he received the deposit.

8 Criminal Law—Evidence—Other Offenses—Relevancy.—In a prosecution of a bank president for receiving deposits with knowledge of the bank's insolvency, false reports made to the Secretary of State, relevant on the issue of defendant's knowledge of the insolvency of the bank, were not objectionable because they also showed the commission of a distinct offense.

9. Criminal Law—Offense—Official Records.—A report of the assets and liabilities of a bank made to the Secretary of State, and signed by defendant as one of the directors, were official records made under authority of law; and hence it was not necessary that the state, in a prosecution of the

Parrish v. Commonwealth.

bank's president for receiving deposits with knowledge of the bank's insolvency, should prove that the reports were signed by accused, before they would be admitted in evidence.

10. Banks and Banking—Bank Officers—Offenses—Illegally Receiving Deposits.—Where a bank remained open for the transaction of business and the reception of deposits, the law would presume that the president assented to the reception of such deposits as were shown by the bank's books.

11. Criminal Law—Appearance of Witnesses—Prejudice.—In a prosecution of a bank president for receiving deposits with knowledge of the bank's insolvency, he was not prejudiced by the fact that some of the witnesses produced by the commonwealth were old and feeble, and had the savings of a lifetime in the bank, while others were poor, laboring women, who intrusted their meager earnings to the bank's keeping.

12. Banks and Banking—Appeal—Evidence.—Representations by accused as to the solvency of the bank of which he was president to persons he was soliciting as depositors and to others were not prejudicial to him in a prosecution for illegally receiving deposits, but corroborated his own evidence that he believed that the bank was solvent.

13. Banks and Banking—Officers—Offenses—Illegally Receiving Deposits—"Insolvency."—The term "insolvency" as used in Ky. St. Sec. 597 (Russell's St. Sec. 2186), providing that, if any president of a bank shall receive or assent to the receiving of deposits with knowledge that the bank is insolvent, he shall be guilty of a felony, means that all of the bank's property and assets are not sufficient to satisfy its debts, and not that it may not have sufficient funds in its vaults to satisfy all of its depositors, or any considerable number of them, on the same day, or in case of a run.

14. Banks and Banking—Officers—Offenses—Illegally Receiving Deposits—Instructions.—Where, in a prosecution of a bank president for illegally receiving deposits with knowledge of the bank's insolvency, there was no effort made by the commonwealth to prove that the bank was insolvent merely because it did not have sufficient cash on hand to pay its depositors, and evidence was offered demonstrating that when the bank received the deposit all its assets, prudently administered, were only sufficient to pay a very small dividend to its depositors, an instruction that a bank is "insolvent," within the meaning of the law creating such offense, when its property and assets are such that it cannot meet its demands in the ordinary course of business should be construed as requiring that the evidence should show that all the bank's assets were insufficient to pay its debts, and was

not, therefore, erroneous as authorizing a finding of insolvency in case the bank had insufficient monetary funds to pay depositors on demand.

15. Banks and Banking—Officers—Offenses—Illegally Receiving Deposits—"Knowledge."—The word "knowledge" as used in Ky. St. Sec. 597 (Russell's St. Sec. 2186). making it a felony for a bank president to receive deposits with knowledge of the bank's insolvency, has no technical meaning, but meant that the officer had knowledge of the existing condition by means of his relation to the bank, his association with it, and his control over it; his direction thereof being such as to give him actual, personal information concerning it.

16. Criminal Law—Appeal—Review.—Under Cr. Code Prac. Sec. 340, providing that a conviction shall only be reversed for errors of law, apparent on the record, which the court will believe prejudicial to the substantial rights of accused on consideration of the whole case, accused, on appeal, in order to obtain a reversal, must affirmatively show errors of law that have prejudiced his substantial rights, and are of sufficient importance to require a new trial.

17. Criminal Law—Trial—Presumption of Innocence.—The presumption of innocense that protects accused ends with a judgment of conviction; it being presumed on appeal that his trial was regular, and that his guilt was duly established.

E. E. KELLY, G. D. CHAMBERS, C. W. WELLS, LAVEGA CLEMENTS and LITTLE & SLACK for appellant.

JAMES BREATHITT, Attorney General, TOM B. McGREGOR, Assistant Attorney General, BEN D. RINGO, CLARENCE M. FINN and J. R. HIGDON for the Commonwealth.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant, Parrish, president of the Owensboro Savings Bank & Trust Company, was indicted for assenting to the receiving of a deposit by it after he had knowledge of its insolvency. The indictment reads as follows: "The grand jury of Daviess county, in the name and by the authority of the commonwealth of Kentucky, accuse James H. Parrish of the crime of assenting to the receiving of a deposit

by the Owensboro Savings Bank & Trust Company after he had knowledge of the fact that said bank was insolvent, said Parrish being then president of said bank, committed in manner and form as follows, to-wit:

Said James H. Parrish was, in the county of Daviess, and state of Kentucky, and before the finding of this indictment, and on the —— day of April, 1908, the president of the Owensboro Savings Bank & Trust Company, which said bank was then and there duly and legally created, organized, and existing as a body corporate under the laws of the state of Kentucky and then and there carrying on a banking business in Owensboro, in said county, and receiving deposits from its customers, with the knowledge and under the authority, consent, and direction of the said James H. Parrish, president thereof, as aforesaid; and said James H. Parrish did then and there, while president as aforesaid, as president aforesaid, unlawfully, willfully, feloniously, and knowingly assent to the receiving of a certain deposit from H. P. Martin & Sons, a partnership composed of H. P. Martin, Wm. H. Martin, C. F. Martin, and Chas. H. Martin, and doing business under the firm name of H. P. Martin & Sons, which was the property of said firm, and of the value of $130, but the items of property making up said deposit are unknown to the grand jury, and said deposit was made with and received by the Owensboro Savings Bank & Trust Company in the regular course of its banking business, and at the time said deposit was received said Owensboro Savings Bank & Trust Company was insolvent, and did not have assets or property sufficient to pay its depositors their claims against said bank, all of which was then and there known to said James H. Parrish,

but the exact amount of liabilities then outstanding against said bank are unknown to the grand jury; and said James H. Parrish, as president of said bank did then and there assent to the receiving of said deposits, and this he did after he had knowledge of the fact that said bank was then and there insolvent and unable to pay any of its depositors, contrary to the form of the statute in.such cases made and provided, and against the peace and dignity of the commonwealth of Kentucky.''

It was found under section 597 of the Kentucky Statutes (Russell's St. Sec. 2186), reading: ''Any president, director, manager, or cashier, or other officer of any bank, or any individual banker who shall receive, or assent to the receiving of deposits after he shall have knowledge of the fact that such bank or individual banker is insolvent, shall be individually responsible for such deposits so received, and shall be guilty of felony, and, upon conviction, punished by confinement in the penitentiary for not less than one nor more than ten years.'' Being put upon his trial, the jury found him guilty, and fixed his punishment at confinement in the state penitentiary for a term of five years. We are asked to reverse the judgment entered upon this verdict for alleged errors committed by the trial court in refusing to sustain a demurrer to the indictment, in admitting incompetent evidence, and in the instruction given to the jury.

The indictment is assailed as insufficient upon two grounds, neither of which are well taken. The argument made by counsel is (1) that the indictment is not certain in designating the nature or character of the deposit or with whom it was made; and (2) that the averment that the bank was ''insolvent, and did not have assets or property sufficient to pay its

depositors," was merely a conclusion of the pleader, and not a statement of fact.

In addition to describing the offense denounced by the statute in the language of the statute, the indictment literally complied with subdivision 2, Sec. 122. of the Criminal Code of Practice, providing that the indictment must contain "a statement of the acts constituting the offense, in ordinary and concise language, and in such a manner as to enable a person of common understanding to know what is intended; and with such degree of certainty as to enable the court to pronounce judgment, on conviction, according to the right of the case." No person of common understanding can read this indictment without being accurately informed of the acts constituting the offense and the nature of the charge. It sets out in substance that Parrish, while president of the bank, knowingly assented to the receiving of a deposit by it, with knowledge at the time that the bank was insolvent and did not have assets and property sufficient to pay its depositors.

It was not necessary that the indictment should describe accurately the items constituting the deposit, or whether they consisted of gold, silver, or paper money, checks or drafts. The averment that Martin & Sons made a deposit in the bank of the value of $130 was sufficient to show that it made it in money, checks, or drafts that aggregated in value this amount. The word "deposit," when used in this connection, has a well-understood popular meaning, and implies that the depositor has placed in the bank money, or evidences or representatives of money, such as banks of deposit are authorized to and do receive. No bill of particulars was necessary in so simple a transaction. The accused knew, or could

easily have ascertained, the exact nature of the deposit, if it was important in his defense, by an inspection of the books of the bank. Nor was it necessary to give the name or style of the office in the bank held by the person who received the deposit. It was not material what person received it; or what position he held in the bank or the name of the individual who made in person the deposit. If the deposit was received by the bank with the knowledge and assent of Parrish, who at the time knew that the bank was insolvent, the offense in this particular was complete without regard to the name or office held by the person receiving it. The averment that the bank was insolvent was not merely a conclusion of the pleader. It was a statement of fact, the truth of which the accused by his plea of not guilty could put in issue, and the commonwealth had to establish by evidence.

To understand the force of the other grounds for reversal relied upon it will be necessary to state in a general way, the salient facts shown by the record, and they may be summed up as follows: Parrish had been connected with the bank for a number of years; first as cashier, then as vice president, and afterwards as president. He was, and had been for many years, the dominating, controlling officer of the institution—in truth, the real manager and director of its affairs. One of his brothers was cashier, and three others were directors. In February, 1908, he caused to be sent out to various persons he was soliciting to become customers of the bank, a statement showing the condition of the bank at the close of business on December 31, 1907.

This statement set out that the assets of the bank—including bills and notes of $1,210,733.87, and cash

due by other banks $121,231.85—were $1,422,580.17, that its capital stock was $200,000, its surplus fund $50,000, and its deposits $1,088,838.96.  In January, 1908, the Secretary of State, under authority of section 593 of the Kentucky Statutes (Russell's St. Sec. 2182), required the bank to make out and send to him a report of the condition of its business on December 31, 1907, and on January 7, 1908, Parrish signed this report as one of the directors of the bank, and it showed that the assets and liabilities of the bank were substantially as represented in the statements sent out to the public.  In April, 1908, upon request of the Secretary of State, he sent him another report of the condition of the bank at the close of business, on the 31st of March, 1908.  This report, which on April 7th was subscribed to by Parrish as one of the directors, stated, among other things that there was due the bank from other banks $85,007.99; that the cash on hand was $41,317.07; that there was due depositors $1,011,302.50, and due other banks $23,848.31.  On the 20th of April the deposit of Martin & Sons was received, and on the day following the attorneys for the bank, with the advice and consent of Parrish, prepared an affidavit, which was signed and sworn to by the cashier, stating in substance that the bank was insolvent.  This affidavit was sent to the Secretary of State, and on the 25th of April, by the direction of the Secretary, an action was instituted to have the bank placed in the hands of a receiver and this was done.

The testimony on the trial in March, 1909, disclosed that all the assets and property of the bank, when converted into money, would not pay its depositors more than 15 cents on the dollar, and that it was hopelessly insolvent when the deposit was received.  That Par-

rish and a few of his near relatives, in flagrant violation of section 583 of the Kentucky Statutes, limiting the amount that any person may owe to a bank, were indebted to it more than $300,000; the indebtedness of Parrish alone being $114,000. That on each day between November 13, 1907, and April 20, 1908, the cash on hand seldom exceeded $1,000, often fell under $500, and on more than one day was less than $100, although under section 584 of the Kentucky statutes the cash should have equaled 5 per cent. of the deposits. But on December 31, 1907, the bank, as shown by the books, had in cash $39,194.30, and on March 31, 1908, $41,317.07.

Without taking up time to point out the fraudulent methods practiced by Parrish through which the cash on hand, at the close of business on December 31, 1907, was swelled on the books from $2,727.79 on December 30th to more than $39,000 on December 31st, we may mention that substantially the same methods were resorted to on March 31, 1908, when the second report put in evidence was made to the Secretary of State. For the purpose of illustrating many dishonest and fraudulent schemes contrived by Parrish, to deceive the public, as well as the state officials, we will mention a few that are typical. At the close of business on March 30, 1908, there was in the bank in cash $1,122.39, and at the close of business on March 31st there was shown by the books $41,317.-07. One of the items that made up this sudden increase in cash assets was $18,848.31, concerning which there was an entry made showing that on March 31st the bank received from the Daviess County Bank & Trust Company that amount of money, and on April 1st an entry was made showing that it paid to the Daviess County Bank & Trust Company this sum.

As a matter of fact, no part of this money was owned by or in the bank at the close of business, but for the purpose of making an appearance of truth in the transaction Parrish, and others acting under his direction, went through the idle form of bringing from the Daviess County Bank & Trust Company to the Owensboro Savings Bank & Trust Company, in the night, after business hours on March 31st, this amount of money, and it was actually kept in the Owensboro Savings Bank & Trust Company for probably an hour, and then taken back to the Daviess County Bank & Trust Company. Like false entries were made on March 31st, showing that the bank had received from other banks and had on hand on March 31, 1908, many thousand dollars, and on April 1st other entries were made showing that these banks had been paid the amount received from them, thus settling and balancing the accounts on the books. After exhausting this method of enlarging by false entries the cash on hand, the reserve was not yet sufficient to satisfy the requirements of the statute, and so Parrish, on March 31st caused the entry to be made that he had deposited $12,000 when in truth he had not deposited a cent; and a few days afterwards another entry was made showing that this sum had been withdrawn from the bank, thus balancing the transaction.

The report to the Secretary of State also showed that there was due from state banks and bankers $64,712.68, and due from national banks $20,295.31. Sixty thousand dollars of this amount was created by the fictitious rediscounting of bills to the Daviess County Bank & Trust Company, on March 31, 1908, and making entries showing that Parish's bank had sold it $60,000 worth of paper, and that it owed his bank this sum, when in fact no bill had really been

discounted to the Daviess County Bank & Trust Company and it did not owe Parrish's bank anything on this account. To close this transaction on the books, on April 6, 1908, entries were made crediting the Daviess County Bank & Trust Company with this $60,000. Other like entries were made with reference to supposed discounting of bills with other banks that were in fact never made. No one of these entries represented a bona fide transaction. They were each and all mere pretenses for the purpose of inducing the Secretary of State to believe from the report that the bank had on hand and there was due to it by other banks, the reserve required by the statute, and for the further purpose of deceiving the public, under whose notice these reports when published might come.

In the course of the trial the commonwealth introduced in its behalf the books of the bank, and the clerks who made the entries to explain them; the affidavit made on April 20th; the reports made to the Secretary of State in January and April; the statements of the condition of the bank sent out by Parrish; the letters written to Parrish by persons interested in the bank, containing suggestions that it was not being prudently managed. Also evidence showing the value of the assets and property of the bank; that its expenses for the three months immediately preceding March 31, 1908, exceeded its income by $10,000, and that 5 per cent. interest was being paid on deposits, the indebtedness of Parrish, members of his family, and corporations that he was interested in; the amount of deposits on hand each day at the close of business; the amount of overdue paper; and the fraudulent entries made for the purpose of showing the money on hand on the days the reports

to the Secretary were made.  A number of deposit-
ors were also permitted to testify that, shortly before
the bank was put in the hands of a receiver, they de-
sired to withdraw their deposits, but were referred
by the cashier to Parrish, who pursuaded them not to
do so, while others testified that they were turned
away with the statement that the bank could not pay
them.  All of this testimony was objected to by coun-
sel for Parrish, and it is earnestly contended in this
court that much of it was incompetent and seriously
prejudicial to his defense.

In prosecutions under the statute it is indispensa-
ble that the commonwealth shall establish three facts:
First, that the deposit described in the indictment
was actually received; second, that at the time it was
received the bank was insolvent; third, that the officer
indicted had knowledge of its insolvency, and, with
such knowledge, assented to receiving the deposit.
For the purpose of proving the insolvency of the
bank, and that Parrish knew this fact, these being
the only disputed issues, it was competent for the
commonwealth to introduce every relevant fact and
circumstance that would throw light upon these two
questions, including the evidence mentioned.  State
v. Sattley, 131 Mo. 464, 33 S. W. 41.  The affidavit;
the letters; the fact that depositors who attempted to
withdraw their deposits were not allowed to do so;
the excessive loans; the high rate of interest paid on
deposits; the value and character of insolvent and
worthless paper; the amount that could be ultimately
realized from the sale or disposal of all the property
and assets, administered in a prudent businesslike
way; the indebtedness of Parrish and his family, and
business concerns that he was interested in; the
fraudulent methods resorted to in making out reports

to the Secretary of State; the failure to keep on hand the reserve fund required by the statute; and the loans to individuals in excess of the amount permitted by law—were each and all facts and circumstances tending to bring home to Parrish knowledge of the condition of the bank, and that it was only enabled to remain open by methods that no prudent banker would indulge in. It was only by evidence of this character that the commonwealth could prove that Parrish had notice that the bank was insolvent.

The point is further pressed that the reports made to the Secretary of State disclosed a state of affairs that would subject Parrish to a prosecution for making false reports, and that in introducing them in evidence and permitting proof of their falsity the commonwealth was in effect putting Parrish on trial for other offenses than the one charged in the indictment. In a limited sense this is true; but it sometimes happens that in criminal cases evidences of crimes distinct from the one under investigation is admissible, as, when they are so closely related in time, place, or circumstance, or so dependent one upon the other, that evidence of one cannot be fully secured without developing facts connected with the other. When this condition is presented, the law, in the interest of justice, and to secure the conviction of the guilty, makes an exception to the general rule that evidence of other offenses is incompetent. Underhill on Criminal Evidence, p. 107; Morse v. Commonwealth, 129 Ky. 294, 111 S. W. 714, 33 Ky. Law Rep. 831, 894.

Nor was it necessary that the trial judge, before permitting these reports to go to the jury, should have required the commonwealth to show that Parrish signed them. They were official records, made out under authority of law, and purported to have been

signed by him as one of the directors of the bank. As
his signature appeared, the presumption was that it
was made by him, and that he knew of their contents,
and therefore, the reports themselves were admissible
without proof of their execution. It is true, these
reports on their face do not show that the bank was
insolvent, but when the commonwealth proved the
illegal methods resorted to by Parrish to make them
conform to the requirements of the statute, it brought
directly home to him knowledge of the desperate con-
dition of the bank. It is also said that the common-
wealth should have shown that parrish received him-
self, the deposit, or assented to the receiving of it, by
directing an employe to receive it, or being present
when it was received. It was not necessary that the
commonwealth should prove either of these facts.
When evidence was introduced that Parrish was pres-
ident of the bank, and that it remained open for the
transaction of business and the reception of deposits
with his consent or with his knowledge, the law will
presume that he assented to the receiving of the de-
posit, and charge him with notice that it was received,
if the books or records of the bank so showed.

The evidence of depositors who wished to withdraw
their deposits and could not, or were referred to Par-
rish, who prevailed on them not to do so, was ad-
missible, not only to show the failing condition of the
bank, but that Parrish was the leading figure in its
affairs and familiar with its business. The fact that
some of these witnesses were old and feeble, and had
the savings of a lifetime in the bank, while others
were poor, laboring women, who intrusted their mea-
ger earnings to its keeping, is complained of as an
effort on the part of the commonwealth to improperly
prejudice the jury against the accused. If the piti-

able appearance and condition of those unfortunate victims of the reckless and criminal mismanagement of Parrish had such effect, he will not be heard to complain of it. His representations as to the solvency of the institution, to persons he was soliciting as depositors, as well as to others, was not prejudicial to him. On the contrary, their statements corroborated his evidence on the witness stand that he believed, the bank to be solvent, and so declared although Parrish himself could not have introduced in his behalf this character of evidence as it would be permitting him to prove self-serving declarations.

Upon the conclusion of the evidence, the court gave to the jury the following instructions:

"(1) The court instructs the jury that, if they should believe from the evidence, to the exclusion of a reasonable doubt, that the defendant, James H. Parrish, in Daviess county, and before the finding of the indictment herein, willfully, unlawfully, and feloniously assented to the Owensboro Savings Bank & Trust Co. receiving from H. P. Martin & Sons, a partnership composed of H. P. Martin, William H. Martin, C. F. Martin, and Charles H. Martin, doing business under the firm name of H. P. Martin & Sons, a deposit of $130, or property to that amount and value, for deposit in said bank; and that same was deposited in said bank; and that defendant at the time he assented to said bank receiving said deposit, if he did so assent, was president of said bank; and that said bank was at the time insolvent, and defendant at said time had knowledge of the fact that said bank was insolvent, if it was so insolvent—then, and in that event, the jury should find the defendant guilty as charged in the indictment and fix his punishment at

confinement in the penitentiary for not less than one nor more than ten years, in their discretion.

"(2)  If the deposit mentioned in the foregoing instruction was received by an employe of the Owensboro Savings Bank & Trust Company, who was engaged as such employe in receiving deposits for and on behalf of said bank while it was conducting its business with the knowledge, and under the general authority of defendant, then defendant assented to the receiving of said deposit within the meaning of the foregoing instruction.

"(3)  A bank is 'insolvent' within the meaning of these instructions when its property and assets are of such character and value that it cannot meet its demands in the ordinary course of its business.

"(4)  The demand of a bank, within the meaning of the foregoing instructions, are all sums owing by it to other banks, firms, corporations, or persons, whether for money borrowed or for money deposited with it either on time certificates of deposit, or on free deposit subject to check; but the amount owing by the bank to its stockholders, as such for its capital stock and surplus, if any, should not be considered as a debt against the bank within the meaning of the foregoing instructions.

"(5)  The jury are further instructed that the defendant is presumed to be innocent and this presumption of his innocence entitles him to an acquittal at their hands, unless his guilt has been proven from the evidence beyond a reasonable doubt."

It is insisted that under instruction No. 3 the jury had the right to find a verdict of guilty if they believed that the bank could not pay all of its depositors on demand; that this fact, according to the definition of "insolvency," was sufficient evidence that the

bank was insolvent. If this was the fair meaning of the instruction, it would not be a correct statement of the law applicable to the case, and if we believed the jury so understood it, we would order a new trial. Although the law undoubtedly contemplates that when a depositor places money in a bank as a general deposit, he shall have the right to withdraw it upon demand, and that the refusal or inability of the bank to permit him so to do would be evidence of its failing condition, it is yet manifest that the mere fact that the bank does not have in its vaults sufficient cash to satisfy all its depositors, or any considerable number of them, on the same day, or in case a run was made on the bank, would not be proof of its insolvency within the meaning of the statute.

A bank might not be able to pay its depositors on demand, and yet be perfectly solvent. It is only when all of its property and assets are not sufficient to satisfy its debts that it is insolvent, and so, for the purpose of ascertaining this fact, it is permissible to go into an investigation of the value of its assets and property as of the date when the deposit is made, and of course their value after that, or at the time of the trial, is competent as illustrating their worth at the time charged in the indictment. But the commonwealth is not obliged to wait until the affairs of the bank are wound up, and it is definitely ascertained what the loss to depositors will be before commencing a prosecution. Whenever a bank fails to discharge its obligations in the ordinary course of its usual and customary business, or closes its doors, or goes into liquidation, it is evidence of its insolvency, and a prosecution may at once be inaugurated. But there can be no conviction unless the evidence conduces to show that when the deposit was received,

all of its property and assets were not sufficient to meet its demands.

It is a matter of common knowledge that banks well managed never have on hand an amount of money equal to their deposits. They are not expected or required to do this, or to anticipate that all their depositors will want their money at the same time. It is a legitimate feature of good banking to lend out so much of the deposits as may not be necessary to meet the demands of depositors in the ordinary course of business, and the statute permits this by providing in section 584 that: "Each bank shall keep on hand at all times at least fifteen per cent. of its total deposits; and in cities with a population of over fifty thousand at least twenty-five per cent. of its total deposits; one-third of which reserve shall be in money, and the balance may be in funds, payable on demand, deposited in other banks."

In view of this statute allowing banks to lend out so large a per cent. of their deposit, it would be absurd to say that the failure to be able to pay all checks presented on demand would be proof of its insolvency. If this test were applied, every bank in the state would be insolvent, because no one of them could presently pay all of its depositors in full. No honest, prudent banker need feel apprehensive that he will be subjected to either indictment or prosecution because the cash on hand at any time is not sufficient to meet the claims of all depositors. And we may add that in no case that has come under our notice were criminal proceedings under statutes like ours instituted until the bank had closed its doors and gone into liquidation. When all of the property and assets of a bank—and these words include every species of property owned by it—are not of sufficient

value to pay its debts, there can be no doubt that the bank is insolvent.  This is what the instruction means when faitly interpreted, and that this was the view of the law entertained by this trial judge, as well as counsel for the commonwealth and the accused, is amply demonstrated by the line of testimony offered in behalf of the commonwealth, as well as the defense on the trial of the case.

The commonwealth undertook to and did establish beyond a reasonable doubt that the value of all the property and assets of every character and description owned by the bank when converted into cash according to approved business methods, and in the manner that prudent business men would follow, would not pay more than 15 per cent. of the amount due depositors.  On the other hand, Parrish attempted to show that the value of the assets and property was amply sufficient to pay in full all depositors. There was no effort made in the trial of the case on the part of the commonwealth to prove that the bank was insolvent merely because it did not have sufficient cash on hand to pay all of its depositors.  Its evidence was all directed to show that, when all the assets and property were converted into cash according to prudent business methods, it would not pay them.  The jury in view of this evidence could not have believed for a moment that the failure of the bank to have on hand cash equaling its deposits, or its inability to pay all or any of the checks when presented, was intended to be sufficient evidence of its insolvency.  It must be assumed that they were men of at least average intelligence, and that in the light of the evidence they fully understood from the instructions that a bank was only insolvent when the

value of its property and assets did not equal its indebtedness.

But, it is insisted that the court should have instructed the jury that "a bank is insolvent when the fair cash value of its assets and property, realizable within a reasonable time, in case of liquidation, as ordinarily prudent persons would ordinarily close up their business, is not equivalent to its liability exclusive of stock liabilities." And this view of the law was taken by the Supreme Court of Wisconsin in Ellis v. State, 138 Wis. 513, 119 N. W. 1110, 20 L. R. A. (N. S.) 444, where an instruction similar to the one given in this case was disapproved, and the instruction requested held to correctly state the law. But there is in truth little substantial difference between the instruction given and the one requested. In each the real test of insolvency is the fact that the value of the assets and property is not equal to the liabilities. The Wisconsin court, however, placed its condemnation of the instruction upon the narrow ground that it imposed upon banks the necessity at all times of keeping on hand sufficient funds to meet depositors' checks presented in the ordinary course of business, and that failing to do this, it was insolvent. We do not so much take issue with the Wisconsin court upon its definition of the word "insolvent" in cases like this as we do upon its interpretation of the instruction which we have endeavored to point out does not mean and was not understood by the jury to have the meaning assigned to it. State v. Beach, 147 Ind. 74, 43 N. E. 949, 46 N. E. 145, 36 L. R. A. 179; State v. Stevens, 16 S. D. 309, 92 N. W. 420; State v. Burlingame, 146 Mo. 227, 48 S. W. 72; State v. Cadwell, 79 Iowa, 432, 44 N. W. 700; Mead-

owcroft v. People, 163 Ill. 56, 45 N. E. 303, 35 L. R. A. 176, 54 Am. St. Rep. 447.

It is further earnestly insisted that the court should have instructed the jury as to the meaning of the word "knowledge" as used in instruction No. 1; and, having this thought in mind, counsel requested the trial court to tell the jury in substance that the word "knowledge" meant an actual guilty knowledge, and not lack of knowledge arising from mere ignorance, resulting from neglect or the failure to keep informed as to the condition of the bank. If the instruction requested was held to be a correct statement of the law, the usefulness of the statute would be greatly impaired, if not wholly destroyed, and it would be a difficult, if not impossible, task to convict the officer of a bank, however careless, negligent, or reckless he might be in the management of its business, of having a guilty knowledge of its insolvency. Although the commonwealth might prove that the bank was totally insolvent, the officer charged by law with the duty of knowing its condition might defeat the prosecution upon the plea that he was negligent or inattentive to its affairs. In prosecutions under this statute, as well as in many other felonies, a criminal intent must exist, and is a necessary ingredient in the commission of the crime; but this intent the law will imply from the acts of the accused when they are sufficient to establish his guilt, and this upon the ground that every accountable person is responsible for the consequences that flow from his acts. Snapp v. Commonwealth, 82 Ky. 173.

The word "knowledge" has no technical meaning, and needs no instruction to define it. It is a word in popular use, and its import is well understood.

Knowledge may be obtained from many sources and in many ways, and is furnished or obtained by a variety of facts and circumstances. But, generally speaking, when we say that a person has knowledge of an existing condition, we mean that his relation to it, his association with it, his control over it, his direction of it are such as to give him actual information concerning it. Accepting this definition as applicable to the present case, there can be no doubt from the facts that the position, relation, authority, and direction of Parrish to the conditions under investigation, and his personal and immediate opportunities of knowledge respecting them, afforded him such knowledge of the insolvency of the bank as was essential under the law to convict him of evil intent of knowingly receiving deposits when the bank was insolvent. It would no more have been proper for the court to have told the jury that negligence or inattention did not excuse lack of knowledge on the part of Parrish than to have instructed them that negligence of intention did excuse it. The jury understood what was meant by the word "knowledge," and they made no mistake in reaching the conclusion that Parrish had such knowledge of the condition of the bank as charged him with notice of its insolvency.

We have considered this case with great care in view of its importance to the banking interests of the state, as well as to the depositing public, and have deliberately reached the conclusion that the accused had a fair trial. It is true that some minor errors were committed by the trial court—they appear in every hotly contested case—but upon the whole no substantial injustice was done. We have more than once announced that it is not every error that will

authorize a reversal. Our jurisdiction is altogether a creature of the statute, and the law that gives us jurisdiction declares, in section 340 of the Criminal Code of Practice, that a judgment of conviction shall only be reversed for error of law "appearing on the record, when upon consideration of the whole case the court is satisfied that the substantial rights of the defendant have been prejudiced thereby." Therefore, when a person who has been convicted of crime appeals to this court, he must be able to affirmatively show errors of law that have prejudiced his substantial rights, and these errors must appear to us to be of sufficient importance to direct a new trial.

The presumption of innocence that protects the accused ends when a judgment of conviction is entered against him in the trial court. On appeal we must and do assume that his trial was regular, and that his guilt was duly established before the tribunal created by law for the purpose of inquiring into it. The statute under which the appellant was convicted was enacted for the protection and security of depositors who comprise a large part of our people, who must and do depend for the safety of their deposits upon the honesty, prudence, and business integrity of the officers of the banks in which they have placed them. As a rule they have no means or opportunity of knowing, except from acts and information furnished by its officers, whether the bank in which the deposit is made is solvent or not; and, when these officers invite the confidence of the public, and by keeping open doors hold themselves out as solvent and responsible, they should be held to a strict accountability for wrongdoing.

Wherefore, the whole court sitting, the judgment of the lower court is affirmed.

HOBSON, J. (dissenting). In defining insolvency the court gave the jury this instruction: "(3) A bank is 'insolvent' within the meaning of these instructions when its property and assets are of such character and value that it can not meet its demands in the ordinary course of its business." The defendant asked the court to give this instruction, which was refused: "The court instructs the jury that the knowledge, which the law requires defendant to have had as to insolvency of the bank, as used in the instructions given in this prosecution, means a guilty knowledge, and not an innocent, actual ignorance arising from neglect to keep posted or to inquire." Section 460, Ky. St. (Russell's St sec. 4174), provides: "All words and phrases shall be construed and understood according to the common and approved usage of language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such meaning." According to common usage a person is insolvent when his assets are not sufficient in value to meet his debts; but, in insolvency and bankruptcy statutes, the word has been given a narrower meaning when applied to persons in trade, and it there signifies inability to pay one/s debts as they fall due in the ordinary course of business, or, as it is sometimes stated, a bank is insolvent when it can not pay its depositors on demand according to its promise. 5 Cyc. 559, and cases cited.

In 16 Am. & Eng. Enc. of Law, 636, 637, the cases are thus well summed up: "As used in the insolvency and bankruptcy laws,

especially when applied to traders or persons engaged in commercial pursuits, the term 'insolvency' generally means the condition of a person who is unable to pay his debts as they become due in the ordinary course of business. According to this definition, a person may be insolvent though he has assets exceeding in value the amount of all his liabilities; and so it has been held that a partnership, as such, may be insolvent though one or more of the individuals composing it are solvent. In its popular and general sense the term 'insolvency' denotes the insufficiency of the entire property and assets of an individual to pay his debts.''

In 22 Cyc. 1256, the conflicting lines of authority are thus set out: ''Insolvency has been differently defined by different courts, and it may be said to have two distinct and well-defined significations. As popularly understood, the term denotes the state of one whose assets are insufficient to pay his debts; or his general inability to pay his debts. But it is, however, frequently used in the more restricted sense to express the inability of a party to pay his debts as they become due in the ordinary course of business.'' The cases sustaining the popular meaning of the word are collected in 4 Words and Phrases, pages 3647, 3648; and the cases sustaining the narrower or more technical definition are given on pages 3650, 3652. All the cases and all the text-books recognize the two definitions of the word. No text-writer and no court has attempted to say that the two definitions mean the same thing. The narrower definition has been applied to banks and persons in commercial pursuits under insolvency laws, and was adopted by the circuit court on the trial.

The question we are to determine is in which sense the word is used in the statute before us. By section 584, Ky. St., each bank shall keep on hand at all times at least 15 per cent. of its total deposits, provided that any bank shall not be required to keep on hand more than 10 per cent. of what are known as savings deposits. The Legislature thus contemplated clearly that the bank might lend out 85 per cent. of its ordinary deposits and 90 per cent. of its time deposits; and, if a time of panic came when its depositors should draw out their money, it might well happen that a bank, however solvent, would be unable to meet for a time the demands of its depositors as they called for their money. In the fall of 1907 a panic swept over the country, and the money stringency caused thereby had not been relieved when this bank failed in April, 1908. During the panic it is a matter of common knowledge that large city banks refused to cash checks in money, and that it was impossible to draw money out of a bank, although the bank was entirely solvent in the ordinary sense of the word. No bank should be required to suspend in such a state of facts, when the trouble is only temporary, and its assets are abundant to protect its liabilities. The closing of the bank, however it might be explained, would increase panicky conditions and business uncertainty. In such a case the depositors would be the first to suffer; for, when a bank suspends, a loss is necessarily thrown on the depositors. The stockholders of the bank would also sustain loss.

The statute should not receive a construction that would make it hazardous for the officers of a bank to keep it open in a time of money stringency like that referred to, when it had abundant assets to protect

its creditors. The officers of the bank are not only trustees for the stockholders, but hold the money intrusted to them for the benefit of the depositors. They must necessarily exercise judgment as to when the bank is insolvent, and should no longer receive deposits. But to require the bank closed whenever it could not pay its depositors on demand in acordance with its promises would be to establish a rule that would not be for the benefit of the depositors or the stockholders in the bank, and it would make the business of conducting a bank so perilous that we can not believe the Legislature intended such a result, when it authorized the bank to lend out 85 per cent. or 90 per cent. of its deposits, and it was well known that if this was done, times would come when the bank could not pay its depositors on demand in accordance with its promises. This view of the statute was taken by the Supreme Court of Wisconsin in Ellis v. State, 138 Wis. 513, 119 N. W. 1110, 20 L. R. A. (N. S.) 444, and of Minnesota in State v. Clements, 82 Minn. 434, 85 N. W. 229. Criminal statutes are not to be extended by construction beyond the fair, natural meaning of the words used. A felony is never created by implication or doubtful interpretation.

The question turns simply on the proper construction of the statute. The words "insolvent" and "insolvency" are used in a number of other sections of the Kentucky Statutes, and in every instance the words are used in their common meaning. Sections 175, 394, 901, 903, 1910, 2183 Ky. St. They are similarly used in the Civil Code of Practice, sec. 168. In the entire legislative history of the state, so far as we can discover, they have never been used in any other sense, and they have been uniformly so

used in the opinions of this court. There being nothing in section 597 to show. that the words are there used in a different sense, they must be given their usual meaning.

The defendant is not guilty under the statute unless he knew that the bank was insolvent. If he had neglected his duty, and from neglect had remained in ignorance of the condition of the bank, he is liable civilly; but he is not for neglect of duty responsible as a felon. On the other hand, he can not shut his eyes to the facts before him and say that he did not know what was patent to a man of ordinary prudence situated as he was. In lieu of construction 3 given by the court, and instruction G asked by the defendant, the court should have given the jury this instruction: "A bank is insolvent, within the meaning of these instructions, when the fair market value of its property and assets, realizable by ordinary care in a reasonable time, is insufficient to meet the demands against it. Ordinary care is such care as is usually exercised by persons of ordinary prudence under like circumstances. The defendant had knowledge that the bank was insolvent if the facts actually known to him were such as would cause a man of ordinary prudence, situated as he was, to so conclude."

The instruction which the court gave could not have been understood by the jury to mean the same as that indicated. The record shows that it was not so intended by the court, and its phraseology evidently shows that the court intended to tell the jury that the word "insolvency" as used in the instruction meant an inability on the part of the bank to meet the demands against it in the ordinary course of business. That this was understood by counsel is plain from the record. The prosecution had read in

evidence the affidavit filed before the Secretary of State for the appointment of a receiver, and that affidavit stated in effect that the bank was unable to pay its depositors according to its promises in the ordinary course of business. The commonwealth attorney in his closing argument read that affidavit to the jury, and also read to them the instruction of the court. He then said: "Pardon me, if I tell the jury when a bank is insolvent. It is insolvent, within the meaning of this instruction, when its paper and assets are of such a character and value that it can not meet its demands in the ordinary course of its business. I tell you that affidavit states that the bank was then insolvent."

Under this argument made by the commonwealth's attorney in his closing speech in the presence of the court, and with its tacit approval, the jury could not have given the instruction any other meaning than that the bank was insolvent if it could not pay its depositors in the ordinary course of business. For the affidavit is in these words: "The affiant, J. Otis Parrish, states that he is cashier of the Owensboro Savings Bank and Trust Company, and while he does not regard the said bank and trust company as being insolvent, but, on account of the recent panic and the stringency of the money market, it has not on hand at this time the legal reserve provided for by law, and has not the sufficient currency and cash reserve to meet its obligations as they mature." When the attorney for the commonwealth, after reading the instruction, read from the affidavit the statement that the bank had not sufficient currency and cash reserve to meet its obligations as they matured, and then said in the presence of the court, "I tell you that affidavit states that the bank was then insolvent," what

other conclusion could the jury draw but that the bank was insolvent if it could not pay its depositors on demand, no matter how abundant its assets might have been then deemed for the ultimate payment of its debts? In Ellis v. State, 138 Wis. 513, 119 N. W. 1110, 20 L. R. A. (N. S.) 444, and State v. Clements, 82 Minn., 434, 85 N. W. 229, judgments of conviction were reversed for the giving of an instruction practically the same as that given here. See, also, 37 Cent. Law J. 147.

It is earnestly insisted that the defendant was not prejudiced by the instruction, that the facts clearly show that the bank was insolvent, and that the defendant could not have known it. But this is a question for the jury. If the defendant's evidence was true, he had reason to believe the assets of the bank were sufficient to meet its liabilities, and a previous jury to whom the case had been submitted failed to agree upon a verdict. It is true that by section 340 of the Criminal Code a judgment of conviction shall not be reversed for an error of law appearing on the record when, upon a consideration of the whole case, the court is satisfied that the substantial rights of the defendant have not been prejudiced thereby. But this does not mean that this court is to be the trier of the facts, and that a judgment of conviction is not to be reversed where upon the evidence we may conclude that the defendant is guilty. The Constitution guarantees to the defendant a trial by jury. A jury trial is a mockery if the real merits of the defendant's case are not submitted to the jury. Where the defendant has had substantially a fair trial on the merits of his case before a jury, a judgment of conviction should not be reversed for minor errors appearing in the record. But in this case

the qeustion when a bank is insolvent and what constitutes knowledge of that fact lay at the basis of the prosecution.

If these questions were not properly presented to the jury by the instructions, then the defendant has not had a jury trial substantially fair on the merits of his case, and when he has not had substantially a fair trial on the merits of his case, his substantial rights have been prejudiced; for there is no right of the defendant in a criminal case more substantial than the right to a jury trial and to have the witnesses face to face. When the defendant has not had substantially a fair trial upon the merits of his case, we can not determine his guilt or innocence here.

To say that a judgment of conviction shall be affirmed, where the defendant's case has been tried upon a false issue, because he is guilty is, in effect, to say that he is so guilty that he is not entitled to a jury trial at all; for why go through the form of a trial if the substance is lacking? To say that evidence was admitted showing that the bank was insolvent, and that, therefore, the defendant was not prejudiced, is to forget that the jury tries the case under the instructions of the court, and what good did it do the defendant to have the evidence admitted when, by the instructions as construed by the commonwealth attorney in his concluding argument, made with the tacit approval of the court, it was insisted that the affidavit filed before the Secretary of State showed that the bank was insolvent? The amendment to the Code referred to was made some 30 years ago, and not a term of this court has passed since at which criminal cases were not reversed when this court believed the defendant guilty, but granted a new trial because he had not had a fair trial upon

the merits of his case; the reason for the rule being that under the Constitution the defendant is entitled to a trial upon the question of his guilt or innocence, not before this court, but before a jury of the vicinage.

The court, in its array of the facts of the case, forgets that it states the facts in the light of the present with all that two or three years has brought out, while the defendant acted simply with the light before him in a time of panic, and before values had shrunken as they appear in the light of this record. The opinion of the court in effect, concedes that the instruction I have above outlined is correct, and should have been given. The opinion is rested upon the ground that the instruction given by the court is, in substance, the same as that I have outlined. No case cited by the court so held. In the cases cited in the opinion the technical definition of the word "insolvency" was followed, and the popular meaning of the word was rejected. In none of these states was there a statute declaring that words should be construed according to their popular meaning. In none of them does it appear that the word "insolvency" was used in its popular sense in all other places in the statutes there in force, or that in the entire legislative and judicial history of the state the word had always been used in its popular sense. To say that the narrower and technical definition is the same as the popular meaning of the word is to say that the many learned courts, who deliberately rejected the popular meaning, and framed the technical definition, did not understand the language which they used, and to deny to the words their usual and natural meaning.

I, therefore, dissent from the opinion of the court. BARKER, J., concurs in this dissent.